**UNITED STATES of America, Plaintiff–Appellee,**

v.

**JUVENILE (RRA–A), Defendant–Appellant.**

No. 98–50368.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1999

Filed Oct. 3, 2000

738

740

Joseph J. Burghardt, Federal Defenders of San Diego, Inc., San Diego, California, for the appellant.

Rene M. Bunker, Assistant U.S. Attorney, San Diego, California, for the appellee.

Before: D.W. NELSON, REINHARDT, and TROTT, Circuit Judges.

Opinion by Judge D.W. NELSON; Dissent by Judge TROTT.

D.W. NELSON, Circuit Judge:

Juvenile RRA–A appeals her conviction for juvenile delinquency, in violation of 18 U.S.C. § 5032, and for conspiring to knowingly and intentionally import and attempt to import marijuana, in violation of 21 U.S.C. §§ 952, 960, 963. She contends that the district court made three errors: (1) failing to suppress the fruits of a warrantless arrest not based on probable cause; (2) finding no prejudicial violations of 18 U.S.C. § 5033's notification requirements; and (3) failing to find that the government violated the timely arraignment provision of 18 U.S.C. § 5033. We hold that RRA–A was prejudiced by violations of 18 U.S.C. § 5033's notification requirements and reverse the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 18, 1999, at approximately 9 a.m., RRA–A, a 16–year old, was the front seat passenger in a vehicle crossing from Mexico into the United States. Other than briefly showing the inspector her border crossing card, RRA–A read a newspaper at the primary inspection booth. Immediately after the inspector asked the rear passenger to move over, however, RRA–A put down her newspaper and invited the inspector to the party that the three vehicle occupants were throwing. As the rear passenger moved over, the inspector noticed that the seat under him had no indentations. The inspector moved the vehicle to secondary inspection, where the vehicle occupants were brought into an office and frisked. RRA–A testified that she felt free to go at that time.

While the vehicle occupants were being frisked, the inspector discovered 80.10 pounds of marijuana in the vehicle. RRA–A was subsequently handcuffed to a bench in a locked security office, where she remained for the next four hours. When Agent Jacobo arrived at approximately 12:00 p.m., he found out that RRA–A did not have a home telephone number. The agent then contacted Assistant United States Attorney Annie Gutierrez and told her that he had a minor in custody whose parents could not be reached because they did not have a telephone. He also told Gutierrez that the minor did not wish for her parents to be notified. Gutierrez told Agent Jacobo that she would notify the Mexican consulate to see if it could assist in locating RRA–A's parents.

At approximately 1:30 p.m., Agent Jacobo, speaking in Spanish, told RRA–A that she was under arrest and gave her a form listing her *Miranda* rights in Spanish. Agent Jacobo asked RRA–A if she understood her rights, including the one regarding the right to a lawyer, and had her initial each paragraph of the form. The agent also inquired as to whether she had any questions about the rights but testified that he did not recall RRA–A having any. Agent Jacobo then proceeded to question her for thirty to forty minutes. RRA–A testified that the agent, during the interrogation, spoke in a loud voice, repeatedly admonished her to tell the truth when she denied involvement, and warned her that she could go to jail for a long time. Agent Jacobo testified that he did not physically threaten her, raise his voice, point weapons at her, or make promises to her; he also noted that RRA–A appeared alert and responsive. After multiple denials, RRA–A cried and confessed to involvement in the crime. At the end of the interview, Agent Jacobo asked RRA–A if she wished to use a telephone.

Meanwhile, at some unspecified time that day between 12:00 p.m. and 2:45 p.m.,

Gutierrez tried to reach the consulate but was unsuccessful. Because Gutierrez had a meeting, she then asked a legal secretary to "contact the Consulate and inform them of the minor's detention, the charges, the place where she would be taken, the arraignment, and the fact that [the U.S. attorney's office] could not contact the parents as they did not have a telephone." At 2:45 p.m., over an hour after interrogation commenced, Gutierrez' secretary reached the Mexican consulate. She advised them of RRA–A's arrest, location, and available parental information; the district court found no evidence that the consulate was informed of RRA–A's rights. The Consul requested to speak with RRA–A.

Early the next morning, on March 19, 1998, Consul Salinas called Gutierrez and told her that he had visited RRA–A the night before and convinced her to give him a neighbor's telephone number. Through the neighbor, Salinas had reached RRA–A's parents. Salinas called Gutierrez again later that morning and informed her that the parents lacked border crossing documents; Gutierrez assisted the parents in obtaining them.

Two days after her arrest, on March 20, 1998, RRA–A was arraigned. On April 3, 1998, RRA–A filed motions to suppress statements, compel discovery, and preserve evidence. On April 10, 1998, the United States responded and filed a reciprocal discovery motion. RRA–A filed a supplemental motion to dismiss based on improper certification pursuant to the Juvenile Delinquency Act. The district court held a motions hearing and bench trial on April 17, 1998. The judge found the pending discovery motions moot and denied RRA–A's motions to suppress and dismiss. The judge then convicted her of juvenile delinquency, in violation of 18 U.S.C. § 5032 (Supp. IV 1998), and of conspiring to knowingly and intentionally import and attempt to import marijuana, in violation of 21 U.S.C. §§ 952, 960 & 963 (Supp. IV 1998). RRA–A timely appeals.

## STANDARD OF REVIEW

 We review de novo a district court's determination that probable cause supported a warrantless arrest and for clear error the finding of facts underlying the determination. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Mixed questions of fact and law are generally reviewed de novo but mixed questions in which factual issues predominate are reviewed for clear error. *See United States v. McConney,* 728 F.2d 1195, 1200–04 (9th Cir.1984). We view parental notification under the Juvenile Delinquency Act as a predominantly factual question, which we therefore review for clear error. *See United States v. Doe,* 862 F.2d 776, 779 (9th Cir.1988) [hereinafter *Doe II* ]. A "statutory claim based on the speedy arraignment provision presents a mixed question of law and fact for which *de novo* review is appropriate." *Id.* This court, at its discretion, can review for plain error issues raised for the first time on appeal when the development of new facts is unnecessary. *See United States v. Tisor,* 96 F.3d 370, 378 (9th Cir. 1996).

## DISCUSSION

### I. PROBABLE CAUSE DURING WARRANTLESS ARREST

RRA–A claims that the government lacked the particularized probable cause required to arrest her as a passenger in the car. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). RRA–A's contention fails, however, because the district court did not err in finding probable cause based on her party invitation at the moment at which the inspector asked the rear passenger to move over to the other side of the car. *See Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657.

## A. Time of Arrest

As a preliminary matter, the parties dispute when the arrest occurred. The standard for making this determination is when "a reasonable person would have believed that [RRA–A] was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The government has more latitude to detain people in a border-crossing context, *see United States v. Og-buehi,* 18 F.3d 807, 812–13 (9th Cir.1994), but such detentions are acceptable only during the time of extended border searches, *see, e.g., id.* (detained and searched soon after crossing border); *United States v. Caicedo–Guarnizo,* 723 F.2d 1420, 1422 (9th Cir.1984) (detained and x-rayed after entering United States by plane).

Based on this case law, the district court properly determined the time of arrest as when RRA–A was handcuffed. RRA–A claims that she was arrested at the time of her detention in the security office, prior to the agents discovering the marijuana and handcuffing her. RRA–A's argument fails, however, to address the fact that this court allows lawful detention during border searches, *see Ogbuehi,* 18 F.3d at 812–13; *Caicedo–Guarnizo,* 723 F.2d at 1422, and that she believed herself free to go at that time. Although frisking RRA–A in a security office certainly constituted a detention, the government's actions did not rise to the level of an arrest until she was handcuffed.

The government's contention that RRA–A was not arrested until she was formally told she was under arrest and read her *Miranda* rights is similarly flawed. RRA–A was handcuffed after the inspector discovered the narcotics in the vehicle, separating that detention from the search itself. A reasonable person handcuffed for four hours in a locked security office after a narcotics search "would have believed that [s]he was not free to leave." *Mendenhall,* 446 U.S. at 554, 100 S.Ct.

1870. Given the totality of circumstances, then, we conclude that RRA–A's handcuffing was the clearest indication that she was no longer free to leave and therefore find it to be the point of arrest.

## B. Probable Cause

Having established the time of arrest, we turn to the question of whether RRA–A's behavior up to the time of her handcuffing provided particularized grounds sufficient to establish probable cause. RRA–A's potentially suspicious behavior consisted of the following. She ignored the inspector, except for briefly presenting her documents, until he asked the rear passenger to move over to the other side of the car. RRA–A then looked up from the paper she was reading and invited the inspector to a party, an invitation which the rear passenger echoed. By moving, the rear passenger shifted from covering the drugs to uncovering them.

We hold that this behavior constituted sufficient grounds for probable cause. RRA–A, rather than being a mere passenger, changed her behavior in a potentially distracting way at the very moment when the inspector was likely to discover the unusual bulge in the seat. The arrest therefore did not rely upon RRA–A's "mere propinquity to others independently suspected of criminal activity...." *Ybarra,* 444 U.S. at 91, 100 S.Ct. 338. Her "relationship, attitude, conduct, [and] utterance" provided a "basis for a rational attribution that [s]he had some interest in the marijuana itself...." *Bettis v. United States,* 408 F.2d 563, 568 (9th Cir.1969); *see also United States v. Buckner,* 179 F.3d 834, 837–40 (9th Cir.1999).

The cases relied upon by RRA–A are distinguishable from the facts here. In *United States v. Soyland,* 3 F.3d 1312 (9th Cir.1993), Soyland was merely present in a vehicle being searched before he was personally searched. Unlike RRA–A, he did not make any suspicious utterances. *See id.* at 1314. Similarly, in *United States v. Robertson,* 833 F.2d 777 (9th Cir.1987),

Steeprow was leaving the house when the police came to arrest Johnson. We found no probable cause to arrest Steeprow as she was merely present at the house. *See id.* at 782. Because the instant case does not involve mere presence, but behavior which the district court, after analyzing the testimony, appropriately found to be suspicious, *Soyland* and *Robertson* do not provide a basis for reversal. We thus affirm the district court's holding that there was probable cause sufficient to support the arrest.

## II. SECTION 5033 NOTIFICATION REQUIREMENT

RRA–A claims that the government violated 18 U.S.C. § 5033's notification requirement in two main ways: (1) failing to notify her of her rights until four hours after she was taken into custody; and (2) failing to notify her parents or the consulate of her custody and rights prior to interrogation.

 This circuit has a three-part test for reviewing Juvenile Delinquency Act claims. We first ask whether the government violated the Act's requirements. *See Doe II,* 862 F.2d at 779. If so, we then inquire as to whether the government's conduct was so egregious that it deprived the juvenile of due process of law. *See id.* If the answer is yes, reversal is required. *See United States v. L.M.K.,* 149 F.3d 1033, 1035 (9th Cir.1998). If the answer is no, we must still decide whether the error was prejudicial. *See Doe II,* 862 F.2d at 779. If the defendant was prejudiced, and irrespective of whether the government's conduct undermined the fundamental fairness of the proceedings, we have discretion to reverse the conviction so as to ensure that the "prophylactic safeguard for juveniles not be eroded or neglected...." *Id.* at 781. We conclude that the government violated the Juvenile Delinquency Act's requirements and, although RRA–A was not deprived of due process, find that the statutory violations were prejudicial. We therefore reverse the conviction.

### A. Violation of Section 5033

 We find that two violations of § 5033 occurred. With respect to RRA–A's immediacy claim, § 5033 requires that the arresting officer "immediately advise [the] juvenile of his legal rights, in language comprehensive to a juvenile...." 18 U.S.C. § 5033 (1985). Because we have found that the arrest occurred at the point of handcuffing, RRA–A was in custody for four hours prior to being read her rights. Although no case law seems to interpret what "immediately" means in a § 5033 context, we do not hesitate in determining that a four-hour delay does not qualify as such.

RRA–A's further claim that she was not read her rights in a language she understood is not, however, supported by the record. As noted above, RRA–A's rights were administered in Spanish by an agent fluent in Spanish who reviewed each paragraph of the form with her and asked her if she had any questions. The totality of circumstances thus suggests that her waiver of *Miranda* rights was knowing and voluntary. *See United States v. Bernard S.,* 795 F.2d 749, 753 (9th Cir.1986).

 With respect to RRA–A's parental and consular notification claim, § 5033 states that "the *arresting officer* ... shall immediately notify ... the juvenile's parents, guardian, or custodian of such custody. The *arresting officer* shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense." 18 U.S.C. § 5033 (emphasis added). In interpreting this provision, this circuit has explained that "[r]easonable efforts should be made to notify the parents of any juvenile taken into custody. For those juveniles whose parents live outside the United States, if it is not feasible to notify a parent or guardian, the government could alternatively notify a foreign consulate in the United States." *United States v. Doe,* 701 F.2d 819, 822 (9th Cir.1983) [hereinafter *Doe I* ].

 We first find that the arresting officer violated § 5033 by double delegating his notification duties. The clear language of § 5033 and our case law require the arresting officer to make the notification: "[T]he text requires the arresting officer—not a subsequent official who might handle the judicial phases of the matter—to carry out all of the notification requirements listed in the lead paragraph of § 5033." *United States v. Doe*, 170 F.3d 1162, 1167 (9th Cir.1999) [hereinafter *Doe III* ]. The agent here, however, neglected his requisite duty and, instead, ceded the responsibility to a federal prosecutor, the Assistant United States Attorney, and then to a secretary in the United States Attorney's office. While conceivable that the arresting officer may in some instances be unable to make the notification directly, the government here fails to provide a reason for the arresting officer's noncompliance with § 5033. *See also Doe II*, 862 F.2d at 779 (noting that the government had failed to make a showing as to why compliance with the notification requirements was not feasible).[1]

 We also find that the arresting officer did not notify the consulate of RRA–A's custody in a timely manner. In a recent opinion, this court explained that "parental notification of the juvenile's *Miranda* rights must be given contemporaneously with the notification of custody." *Doe III*, 170 F.3d at 1167. This timing sequence is necessary to ensure that § 5033 provides juveniles with "meaningful protection." *Id.* at 1168. Applying this concept to consular notification, we hold that, where parental notification is not feasible, the arresting officer must make reasonable efforts to notify the consulate of the juvenile's custody and rights prior to interrogation. We clarify below the meaning of this requirement.

 A primary purpose of notifying the consulate of the juvenile's arrest is to facilitate contact with the parents. Arresting officers often have difficulty reaching parents in foreign countries, particularly when juveniles do not cooperate. Juveniles cannot, however, waive their right to parental notification even if they hinder

---

1. The dissent asks us to clarify the reasoning behind the rule of restricting the notification duty to the arresting officer. First and foremost, we adhere to the established principle of giving effect to the unambiguously expressed intent of Congress. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Congress, in § 5033, specifically requires the "arresting officer" to make the requisite notifications and we have no statutory or legal basis to conclude that a prosecuting officer—in this case an Assistant United States Attorney—or a secretary of the prosecuting officer qualify as representatives. Second, we abide by circuit precedent. *See Morton v. De Oliveira*, 984 F.2d 289, 292 (9th Cir.1993). In *Doe III*, we addressed both *who* carried the notification requirements and *when* the notification had to occur: *"[T]he text requires the arresting officer*—not a subsequent official who might handle the judicial phases of the matter—to carry out all of the notification requirements listed in the lead paragraph of § 5033. *The statute also requires immediate parental notification* as to the existence of initial custody . . . ." 170 F.3d at 1167 (emphasis added). Irrespective of how "outlandish" a judge might construe the

aim of Congress or circuit precedent to be, we do not have the authority to impose the statutory intent or rule we might prefer in their place. The dissent also emphasizes the importance of "context," "common sense," "agency," and the "real world" in the application of rules. We agree and have recognized that circumstances may arise under which the arresting officer may be unable to satisfy the notification requirement. The hypotheticals spun by the dissent are, however, inapplicable here. The arresting officer did not delegate his duties to an immediate supervisor or partner; he delegated them from his office to the federal prosecutor's. Keeping in mind the real world, we see no reason why this delegation was necessary and the government fails to proffer any explanation. Finally, the dissent concludes that any error was harmless because RRA–A told the arresting officer that she did not want her parents to be involved. Under the law of our circuit, however, juveniles cannot waive their right to parental notification. *See L.M.K.*, 149 F.3d at 1035. In total, we respectfully find the dissenting opinion untenable. We also note that it addresses only the first violation of § 5033.

notification. *See L.M.K.,* 149 F.3d at 1035. Consular notification addresses this problem by providing an in-country mechanism for locating parents of alien juveniles.

■■■■ Another important function of consular notification is to permit diplomatic officials to become involved as surrogates for parents who are not in the country. In *Doe III,* we recognized the importance of parental involvement during interrogation if minors are " 'not to become the victim[s] first of fear, then of panic'...." 170 F.3d at 1167 (citing *Haley v. Ohio,* 332 U.S. 596, 600, 68 S.Ct. 302, 92 L.Ed. 224 (1948)). Where, as here, the juvenile is a foreign national, the potential discombobulation may be even more resonant due to language differences and an exacerbated sense of isolation and helplessness. Consular notification of the juvenile's custody and rights must thus occur as soon as reasonably possible after the arresting officer has difficulty contacting the foreign national juvenile's parents so that the minor has access to meaningful support and counsel. *See Doe II,* 862 F.2d at 781 (noting that isolation from family, friends, representatives of the minor's country, or an attorney could result in harmful error).

■■■■ Because consulates generally can be reached expeditiously, the arresting officer must read the juvenile his or her *Miranda* rights but delay interrogation of the juvenile for a reasonable time to allow consular notification and response. We recognize, however, that the timely arraignment requirements of § 5033 require minimal delays. If consular notification and response cannot occur within a reasonable time, such as a few hours, the arresting officer may proceed with the juvenile's interrogation and arraignment. Furthermore, delays due to consular notification constitute extenuating circumstances which may excuse a more lengthy wait for arraignment or interrogation.

Applying this logic to the instant case, Agent Jacobo, the arresting officer, provided insufficient notification. In addition to failing to contact the consulate directly, Agent Jacobo did not wait a reasonable amount of time to allow contact with the consulate. Gutierrez's secretary reached the consulate just over an hour after RRA–A's interrogation began. By delaying a few hours, Agent Jacobo would have been able to determine whether the parents could be located expeditiously and, while they were being found, consular officials could have provided RRA–A with the support and counsel intended by the § 5033 notification requirement.

## B. Due Process Violation

Having established two violations of § 5033, the question becomes whether either constitutes government conduct so egregious that it deprived RRA–A of due process of law. *See Doe II,* 862 F.2d at 779. We find that neither violation is sufficiently severe.

■■■ First, although a four-hour delay in reading rights violates the immediacy requirement of § 5033, RRA–A was read her rights before any interrogation took place. Because the primary purpose of *Miranda* is to provide a procedural protection against self-incrimination, *see Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and RRA–A was read her *Miranda* rights before she incriminated herself, the delay here does not constitute a due process violation.

■■■ The second § 5033 violation involves timeliness of parental and consular notification. In *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court held that failure to give parents timely notice of a hearing "in which a youth's freedom and his parents' right to his custody are at stake" violates due process. *Id.* at 33–34, 87 S.Ct. 1428. This court has, however, held that interrogation without parental notice does not provide a basis for suppressing the resulting confession on due process grounds. *See Doe III,*

170 F.3d at 1168; *Harris v. Wright*, 93 F.3d 581, 586 (9th Cir.1996). The failure to make reasonable efforts to notify the consulate of RRA–A's custody and rights prior to interrogation therefore does not constitute a due process violation under this circuit's law.

## C. Harmlessness

██ Because the § 5033 violations here are not egregious enough to constitute due process violations, we must now determine whether RRA–A was prejudiced by the errors. *See Doe II*, 862 F.2d at 779. "If the statutory violations did not rise to the level of constitutional violations but nonetheless prejudiced [RRA–A], we have discretion to reverse or to order more limited remedies so as to ensure that her rights are safeguarded and the will of Congress is not thwarted." *Id.* at 780–81. This circuit has adopted a two-step test for determining prejudice. We first inquire as to whether "the violation was *a cause of* the confession...." *Doe III*, 170 F.3d at 1168 (emphasis added). In other words, did RRA–A's confession come "*in part* as a result of [her] isolation from family, friends, [or] representatives of [her] country or an attorney ...."? *Doe II*, 862 F.2d at 781 (emphasis added). If so, we then "look to the prejudice caused *by* the confession." *Doe III*, 170 F.3d at 1168.

██ The arresting officer's failure to fully notify the consulate prior to interrogation "needlessly isolated [RRA–A] in a strange environment and deprived [her] of support and counsel during the pre-arraignment period." *Id.* at 781. Prior to being interrogated, RRA–A was handcuffed to a bench in a locked security office where she remained for four hours. During interrogation, Agent Jacobo warned RRA–A to tell the truth and apprised her that she could go to jail for a long time. After being questioned for approximately thirty to forty minutes, RRA–A began to cry and confessed her involvement in the crime. Only after the interrogation did Agent Jacobo offer RRA–A the opportuni-

ty to make a phone call. We cannot know for sure that the government's notification failure was *the* cause of RRA–A's confession nor is such a finding required. We look to see whether the confession was *in part* a result of the § 5033 violations or, in other words, *a* cause of the confession. Despite RRA–A's apparent maturity, we keep in mind that this 16–year old was handcuffed, arrested, interrogated, and threatened with jail by law enforcement agents of a country foreign to her, and she faced this sequence of events alone. On these facts, we can presume that RRA–A's isolation from family, lawyers, and country representatives—individuals who may have been able to provide counsel and support— was, at the very least, *a* cause of her confession.

Our final inquiry is whether RRA–A's prosecution resulted from her confession. The record is clear that RRA's confession was the primary basis of evidence on which she was convicted. Under these circumstances, we have no doubt that the errors were prejudicial. *See Doe II*, 862 F.2d at 779. RRA–A's confession should, accordingly, have been suppressed. *See United States v. Doe*, No. 219 F.3d 1009, 1018 (9th Cir.2000).

## III. SECTION 5033 TIMELY ARRAIGNMENT

RRA–A claims that the 48–hour delay in arraigning her violates § 5033's timely arraignment provision. This claim has merit as we have held that a delay of 36 hours *without extenuating circumstances* violates § 5033's arraignment provision. *See L.M.K.*, 149 F.3d at 1035; *Doe II*, 862 F.2d at 780. We choose, however, not to reach this issue as RRA–A raises it for the first time on appeal and the district court therefore made no findings regarding extenuating circumstances or whether the arraignment delay caused prejudice. As further factual development is necessary to address this argument, we decline to review it. *See Tisor*, 96 F.3d at 378.

## CONCLUSION

For the foregoing reasons, we RE-VERSE the district court's conviction and REMAND.

TROTT, Circuit Judge, dissenting:

My able colleagues' astringent reading of "the arresting officer" in § 5033 is patently wrong as illustrated by its strange consequences. It turns the law into a formalistic dance where the importance of the form becomes where one puts one's foot rather that what the dance is intended to convey. I respectfully believe that *who* notifies an arrestee's parents or a consulate is unimportant; what matters is the timing and the content of the message.

The context of *this* case and the discrete issue we address encompasses parents who live outside the United States and who most probably do not speak English, yet according to my colleagues, only the "arresting officer" may talk to them. Delegation is not lawful, even from an arresting officer who does not speak the requisite language to someone who does. Apparently, the "investigating officer" to whom the "arresting officer" reports, or for that matter the arresting officer's partner or immediate supervisor, is now legally prohibited—short of undefined exigent circumstances—from taking over the task because—and only because—that person is not the "arresting officer." If I the arresting officer ask my Spanish speaking partner to make the call, and she gets through and accomplishes the notification, is it defective because I, the "arresting officer," did not do the talking? What happened to common sense? To agency? To the real world? The reason for restricting the notification duty to "the arresting officer" escapes me. What is the principle behind this rule? We have found lurking in the penumbra of this case a new enemy of the law—double delegation.

Section 5033 says also that the "arresting officer" "shall immediately notify the *Attorney General,*" does this mean Officer Ox has to talk personally to Janet Reno?

We have construed in other contexts "the Attorney General" to mean her representatives, but we do extend that minimal courtesy to arresting officers. For example, in 8 U.S.C. § 1326 prosecutions for illegal reentry into the United States after deportation following conviction for an aggravated felony, one of the elements of the crime is that the entry be *"without the express consent of the Attorney General for such entry;* ...". § 1326(a) and (b)(2). Notwithstanding this tight language calling for the *express consent of the Attorney General,* courts have uniformly allowed the delegation by the Attorney General of this function to the INS. *United States v. Blanco–Gallegos,* 188 F.3d 1072, 1075 (9th Cir. 1999); *United States v. Oris,* 598 F.2d 428, 430 (5th Cir.1979). With all respect to the distinguished author of the majority opinion in this case, at the very least we would be well-served by attempting to distinguish *Blanco–Gallegos,* published by a panel of which she was a member. Given *Blanco–Gallegos,* the majority's reliance on *Chevron* and "plain language" is not convincing. Delegation per se is simply not a problem in these cases. "Ceded the responsibility" certainly sounds indiscrete, but such an innocuous act is appropriate in many situations, including this one.

The majority here disclaim any responsibility for this outlandish holding, asserting that they are merely following precedent. They point to a sentence in our opinion in *United States v. Doe,* 170 F.3d 1162 (9th Cir.1999) (*"Doe III"*) as the culprit. In *Doe III,* we noted in discussing § 5033 that "the text requires the arresting officer—not a subsequent official who might handle the judicial phases of the matter—to carry out all of the notification requirements listed in the lead paragraph of § 5033." *Id.* at 1167.

There are two problems with the majority's reliance on this sentence.

First, it is *not* a holding that *only* the arresting officer may handle the notification. The clear point of the sentence is

timing, i.e., it's too late if the notification is handled by a "subsequent official handling the judicial phases of the matter." The issue being addressed in *Doe III* was not who had to accomplish the notification, but whether " § 5033 requires the government to inform the juvenile's parents of the juvenile's Miranda rights." *Id.* Our answer to this question was "yes," because (1) children need parental involvement during interrogation; and (2) the information the parents most need at that moment is contained in *Miranda* advisement. Thus, the sentence upon which the majority relies is inappropriately used by them out of context to support their holding.

To erase any lingering doubt about what *Doe III* stands for, I have retrieved and examined the briefs filed in that case and confirmed and discovered the following.

As described in the opinion, the "arresting officer" in *Doe III*, one Agent Plitt, did contact the juvenile's mother in that case and told her that he had arrested Doe in connection with a vehicle loaded with narcotics that her son was driving. What Agent Plitt did *not* do was advise the juvenile's mother of the juvenile's Miranda rights. The relevant issue in *Doe III* was whether the law and § 5033 required Plitt to include *Miranda* information in the parental notification. *Doe III* held that such information was required. The issue of *who* must accomplish the notification appears nowhere in the briefs, nor could it in view of the fact that the arresting officer was the one who made the contact. Moreover, Agent Plitt told the juvenile, as the panel's opinion recommends, that he would see an attorney within one or two days of his arrest, depending upon who prosecuted him. This wayward advice explains the panel's reference to a "subsequent official who might handle the judicial phases of the matter. . . ." To quote the panel, "Plitt's response [to the juvenile] addressed when, in the course of the *judicial process,* Doe would be appointed counsel." (Emphasis added).

The second problem is simply that if this sentence is a holding that binds us as

precedent, it is dead wrong. As *Doe III* recognizes, all the purposes of parental and surrogate consular notification are accomplished in the substance, content, and timing of the notification, *not* in who actually speaks to the parents. Can anyone imagine an opinion by a panel of this court reversing a conviction because the arresting officer's partner instead of the arresting officer called the juvenile arrestee's parents at the very moment of the arrest and fully notified them of everything required by the law? Of course not, but this odd result is precisely what would be required by this case. My colleagues' holding gives new meaning to "form over substance."

In passing, I would note that Agent Plitt, the arresting officer, did not actually talk to the "parents" as required by the statute, but to a second family member who served as an interpreter. Under my colleagues' approach, I would assume that this deviation, too, from the statutory language would be a fatal defect. After all, the statute says "parents," not "or their interpreter."

Finally, the "failure" to notify in this case was harmless beyond all doubt. Buried in the majority's opinion is a telling fact: Gutierrez knew how to reach her parents but told "the arresting officer" that she did not want them involved. It was RRA–A who kept her parents out of this case, *not* the agents. Her wishes and her state of mind were the combined independent cause of her confessions, not "the violation." The district court specifically found her to be mature and intelligent, and not timid. During the inspection, for instance, she was calm and collected as she sought to divert the inspector from the marijuana, while her cohorts were visibly nervous. She knowingly and voluntarily waived her rights. This "error" was harmless because it had *no* effect on her confession. I respectfully dissent.