UNITED STATES of America, Plaintiff–Appellee,

v.

Rogers BUTLER, Jr., Defendant–Appellant.

No. 99–50752.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 2001

Filed May 17, 2001

George W. Hunt, San Diego, California, for the defendant-appellant.

Gregory A. Vega, United States Attorney, Jonah H. Goldstein, Assistant United States Attorney (briefed), and Patrick K. O'Toole, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: BOOCHEVER, SILVERMAN, Circuit Judges, and GEORGE,* District Judge.

SILVERMAN, Circuit Judge:

We once again consider at what point a "border inspection detention" may have evolved into "custody" triggering the requirement of *Miranda* warnings prior to questioning. In this case, while agents conducted an intensive inspection of the defendant's car, he was taken to the inspection station's security office, patted-down, and placed in a locked holding cell where his shoes and belt were confiscated. We hold that upon being placed in the holding cell, Butler was in custody and should have been advised of his rights prior to any further questioning, whether or not probable cause to arrest had yet been developed. Although his subsequent statements in response to questioning should have been suppressed on *Miranda* grounds, the district court's failure to do so was harmless in light of overwhelming evidence of guilt. We affirm.

I. Facts

On April 13, 1999, Butler entered the United States from Mexico at the Tecate Port of Entry. U.S. Customs Inspector James Chasse, working at the primary inspection area, asked Butler where he had been. Butler stated that he had been in Mexico visiting his girlfriend. Chasse asked Butler how long he had spent in Mexico, and Butler stated "two to three days." Chasse noticed that the only thing in the car besides Butler was a picture; he did not see an overnight bag or toiletry kit.

---

* The Honorable Lloyd D. George, Senior United States District Judge for the District of Nevada, sitting by designation.

The lack of luggage aroused Chasse's suspicions. Butler showed Chasse a picture of patio furniture and stated that he had gone to Mexico looking for a patio set. Chase asked Butler who the car belonged to, and Butler responded that it belonged to his friend Daniel. Chasse asked Butler for Daniel's last name, but Butler said he did not know it. Chasse then escorted Butler to the secondary inspection area for further inspection.

At secondary, U.S. Customs Inspector Albert Hallor looked inside the car and also noticed the lack of any personal items and that it was extremely clean. Hallor asked Butler who owned the car. Butler could not provide the name of the owner but said that he was going to buy it. Hallor asked Butler about the purpose of his trip to Mexico. Butler replied that he went to see his girlfriend and look at patio furniture. When Hallor asked Butler to provide a location in Mexico where he had looked for the furniture, Butler looked away and remained silent for about thirty seconds. Hallor repeated the question but Butler did not provide a response. When Hallor asked Butler for the keys to the car, he noticed that Butler's hands were shaking. Hallor asked Butler to step out of the car. He frisked him, then escorted Butler into the foyer of the security office.

Hallor took Butler into the pat-down room and conducted a more thorough search, then placed him in a locked "open-screen" cell inside the pat-down room and removed his shoes and belt. Hallor then drove Butler's car to the impound lot, where fourteen packages of marijuana were found concealed in the front driver's side door, front passenger door, trunk and rear quarter panels. The fourteen packages weighed 46.8 pounds and had a retail value of $37,440.

Customs Senior Inspector Leroy Steinauer testified that he contacted Butler in the holding cell in the security office. Steinauer had not yet been made aware that a drug-detection dog had alerted to the presence of drugs in Butler's car or that any drugs had been found. Without first having advised Butler of his rights, and while Butler remained in the holding cell, Steinauer asked Butler the purpose of his trip to Mexico; Butler stated that he had gone to visit his girlfriend. Steinauer asked Butler how long he was in Mexico; Butler stated from Sunday to Tuesday. Steinauer asked Butler if he remained in Tecate the entire time, and Butler responded, "Yes." Steinauer asked Butler who the car belonged to, and he replied that it belonged to a friend. Steinauer asked Butler if he had maintained possession of the car the entire time he was in Mexico, and Butler stated that he had.

Customs Special Agent Jeffrey Deal was called to the Tecate Port of Entry to transport Butler to jail. He testified that he took biographical information from Butler and collected his personal items. Butler did not have a checkbook, credit card or any type of formal identification. Butler asked Deal to which jail he would be taken. Deal answered that Butler was going to the Metropolitan Correctional Facility. Butler asked whether it was state or federal, and Deal replied that it was federal. Butler asked if he could go to a state jail instead, and Deal said that he could not. Butler then asked Deal if "there was any way" he could go to a state jail and Deal said no. Butler then asked "how much time" he was looking at, and Deal stated that he didn't know. Butler then said, "I messed up."

Prior to trial, Butler moved to suppress the statements he made while being questioned in the holding cell by Inspector Steinauer without first having been advised of his *Miranda* rights. Butler did not challenge the admissibility of the statements he made previously to Chasse and

Hallor, or the statements he made to Deal on the way to jail. The district court found as a matter of fact that Butler *was* in custody at the time he was questioned by Steinauer, but that the *Miranda* requirements had not attached because the agents had not yet developed probable cause to arrest Butler at the time he was placed in the cell.

At trial, Butler testified about his trip to Mexico to see his girlfriend, that he went to the beach in Rosarito, Mexico with her, stayed with her aunt Sandra, and discussed with her aunt the purchase of patio furniture. He testified that while he was at her aunt's house, a person named Oscar appeared and offered to sell him his red Nissan Sentra. Butler paid Oscar a $300 down payment (he still owed $500–$800), and then attempted to drive the car back to the United States to see if it could pass a smog test. He knew nothing about the marijuana found in the car at the Tecate Port of Entry. Butler denied telling any of the customs inspectors that he had maintained possession of the car the entire time he was in Mexico. He also denied telling the inspectors where he was coming from with the car.

Butler was found guilty by a jury of two counts: importation of marijuana and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 952, 960, and 841(a)(1). He was sentenced to two concurrent terms of 41 months imprisonment.

## II. Jurisdiction and Standards of Review

We have jurisdiction under 28 U.S.C. § 1291. Whether a person is entitled to *Miranda* warnings is an issue of law to be reviewed de novo. *United States v. Nieblas,* 115 F.3d 703, 705 (9th Cir. 1997). We review the district court's factual finding that the defendant was in custody for *Miranda* purposes for clear error. *People of the Territory of Guam v. Palo-*

*mo,* 35 F.3d 368, 375 (9th Cir.1994). The admission of statements made in violation of a person's *Miranda* rights is reviewed for harmless error. *United States v. Polanco,* 93 F.3d 555, 562 (9th Cir.1996).

## III. Analysis

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that because of the inherently coercive nature of custodial interrogation, a person must be advised of his rights prior to questioning. Of course, not all questioning by law enforcement officers triggers the warning requirement. The sine qua non of *Miranda* is custody. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602.

The case books are full of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not "in custody" for *Miranda* purposes. A traffic stop is not custody. *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). A *Terry* stop-and-frisk is not custody. *See id.; United States v. Bautista,* 684 F.2d 1286, 1291 (9th Cir.1982). And a brief detention at the border by immigration and customs officials of persons presenting themselves for admission to the United States is not custody, even though such persons are not free to leave or to refuse to be searched.

It is well recognized that special rules apply at the border. In *United States v. Leasure,* 122 F.3d 837 (9th Cir. 1997), the defendant drove a van from Mexico to the San Ysidro Port of Entry and was asked questions. At some point during the questioning, a drug dog alerted to the presence of drugs while the van was still in primary inspection. As soon as the

inspector became aware of the dog alert, he instructed Leasure to get out of the vehicle and then escorted her to the secondary inspection area. She was not free to go. While Leasure waited in the secondary inspection area, marijuana was found in the van. She moved on *Miranda* grounds to suppress the statements she had made to the *first* inspector while she was still in the van at primary inspection. We upheld the district court's denial of Leasure's motion to suppress.

> Stops and routine questioning are the norm at the border in the primary inspection areas. In most cases, the earliest that a person could be in custody is at the point when she is moved into a secondary inspection area and asked to exit her vehicle while it is searched. Leasure's is a typical case.... The first inspector approached Leasure and asked her several questions as to why she went to Mexico and what she had done there. It is immaterial whether his questioning at that stage continued after [the dog] had alerted on the vehicle or not. Objectively, there was nothing to suggest that Leasure was in custody before she was asked to step out of her vehicle.

*Id.* at 840.

■ The district court misread *Leasure* to mean that unless the questioning agents have probable cause to arrest, *Miranda* warnings need not be given in border situations, no matter what the circumstances. It is true that *Leasure* contains the following language: "[Other border cases] have all held that *Miranda* warnings need not be given in a border crossing situation unless, and until, the questioning agents have probable cause to believe that the person has committed an offense." *Id.* However, the *Leasure* court also said, "The *results* of those [other border cases] remain good law but for *reasons* somewhat different than advanced in them." *Id.*

(Emphasis added.) It pointed out that the Supreme Court in *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) "direct[ed] the reviewing court to look to the objective circumstances of the interrogation, not to the subjective view harbored by either the suspect or the interrogating officers to determine whether the defendant is in custody." *Leasure,* 122 F.3d at 840.

■ Although the existence or non-existence of probable cause might be one factor to consider in determining someone's custodial status in the twilight zone between detention and custody, what ultimately matters to the determination of whether *Miranda* is triggered is *custody,* which is determined not by the existence of probable cause, but by looking to the "objective circumstances of the interrogation," *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526. Those circumstances include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt. *United States v. Hudgens,* 798 F.2d 1234, 1236 (9th Cir.1986).

In *Leasure,* the defendant merely had been delayed for questioning and the search of her belongings; she was not free to go, but neither was she jailed, handcuffed, or subjected to anything besides inconvenience or delay. In *United States v. Estrada–Lucas,* 651 F.2d 1261 (9th Cir. 1980) the defendant simply was asked by the primary inspector what she was bringing back from Mexico; then he searched her duffel bag. She was not free to leave, but she was not restrained in any way.

In sharp contrast to the facts of *Leasure* and *Estrada–Lucas* is *United States v. RRA–A,* 229 F.3d 737 (9th Cir.2000). There, a juvenile was a passenger in a car

entering the United States from Mexico. After the juvenile invited the primary inspector to the party that occupants of the car were going to throw, the inspector moved the vehicle to secondary. The occupants then were brought into an office and frisked. While that was going on, 80.10 pounds of marijuana were discovered. At that point, the juvenile was handcuffed to a bench in the locked security office where she remained for four hours. The juvenile contended that her arrest occurred earlier, when she was frisked in the security office. The government argued that the juvenile was not in custody until sometime later, after she was formally told that she was under arrest. We upheld the district court's ruling the juvenile was arrested as of the time she was handcuffed, not before as she claimed, and not after as the government contended.

> [T]he district court properly determined the time of arrest as when RRA–A was handcuffed. RRA–A claims that she was arrested at the time of her detention in the security office, prior to the agents discovering the marijuana and handcuffing her. RRA–A's argument fails, however, to address the fact that this court allows lawful detention during border searches, and that she believed herself free to go at that time. Although frisking RRA–A in a security office certainly constituted a detention, the government's actions did not rise to the level of an arrest until she was handcuffed.
>
> The government's contention that RRA–A was not arrested until she was formally told she was under arrest and read her *Miranda* rights is similarly flawed. RRA–A was handcuffed after the inspector discovered the narcotics in the vehicle, separating that detention from the search itself. A reasonable person handcuffed for four hours in a locked security office after a narcotics search would have believed that [s]he was not

free to leave. Given the totality of circumstances, then, we conclude that RRA–A's handcuffing was the clearest indication that she was no longer free to leave and therefore find it to be the point of arrest.

*Id.* at 743 (citations and internal quotations omitted).

It is true that the agents had found the drugs before the juvenile had been handcuffed, but the key to the case is not that the drugs had been found, but that to a reasonable person, being handcuffed to a bench for hours in a locked office is more than a temporary detention occasioned by border-crossing formalities of the routine sort described in *Leasure* or *Estrada–Lucas*. To a reasonable person, being handcuffed to a bench in a locked office means that he or she is in custody.

■■■■■■ We recognize that "the government has more latitude to detain persons in a border-crossing context." *United States v. Doe,* 219 F.3d 1009, 1014 (9th Cir.2000). It is true that the mere detention of a person in a border station's security office from which he or she is not free to leave, while a search of a vehicle occurs, is not "custody" for these purposes. In *Doe,* we held that a juvenile was not in custody as he merely sat on a bench in the security office while a search of his car occurred. However, the situation changed from detention to custody when, after marijuana was found in his car, the juvenile was placed in a locked cell. At *that* point, we said, "[n]o reasonable person would have believed he was free to leave." *Id.* As in *RRA–A,* the key fact was not that drugs had been found, but that the juvenile's physical circumstances had changed from sitting on a bench in an office to being locked in a cell. Although the discovery of the drugs prompted the agents to move the juvenile from the security office into a cell, it was *locking the juvenile*

*into a cell,* not what prompted it, that marked the change in the juvenile's custody status.

In the case at the bar, the district judge found that Butler was in custody when he was locked in a holding cell and had his shoes and belt confiscated. This finding is not clearly erroneous. However, the district judge was mistaken as a matter of law when he then held that because the agents had not yet developed probable cause to arrest Butler, they were excused from advising Butler of his rights prior to interrogating him in his cell, regardless of his custody status. Because he was in custody, Butler should have been given his *Miranda* warnings prior to further questioning, and therefore, the district court should have granted Butler's motion to suppress the statements he made to Steinauer in the holding cell.

### IV. Harmless error

■ Although the statements to Steinauer should have been suppressed, the failure to do so was harmless beyond any doubt. Even without the statements to Steinauer, the evidence of guilt was overwhelming. In the first place, most of what Butler told Steinauer was repetitious of statements he made at primary inspection, and indeed, to Butler's own trial testimony. Second, Butler was the sole occupant of a vehicle carrying over 46 pounds of marijuana. Third, Butler's spontaneous statement to Agent Deal while on the way to jail—"I messed up" is strong evidence of guilt. Finally, Butler's defense—that while in Mexico, someone sold him a used car for $300 that secretly contained $37,000 worth of illegal drugs—is less than compelling.

AFFIRMED.