**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOSE D.L. (JUVENILE),
*Defendant-Appellant.*

No. 05-50597

D.C. No.
CR-05-00814-MLH

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
April 5, 2006—Pasadena, California

Filed June 30, 2006

Before: Myron H. Bright,* Harry Pregerson, and
Arthur L. Alarcón, Circuit Judges.

Opinion by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Alarcón

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

## COUNSEL

Michelle Betancourt, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

Randy K. Jones, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

PREGERSON, Circuit Judge:

Defendant Jose A. appeals the district court's finding that he is a juvenile delinquent under 18 U.S.C. § 5032. On May 10, 2005, fifteen-year-old Jose was arrested after government agents found cocaine hidden in the vehicle he was driving from Mexico into the United States. Because Jose was a minor, the provisions of the Juvenile Delinquency Act, ("JDA") 18 U.S.C. § 5031 *et seq.* apply. We have jurisdiction under 28 U.S.C. § 1291. We reverse in part and remand for further proceedings.

## I.   Factual Background

### A.   Arrest and Detention

On May 10, 2005, at approximately 4:15 p.m., fifteen-year-old Jose attempted to cross the United States—Mexico border at the San Ysidro, California, Port of Entry. Jose was driving a gray Toyota 4-Runner with a Mexican license plate. When Border Patrol Officer Mark Hill questioned him, Jose stated that the vehicle was his, then changed his answer to say that it belonged to his uncle. Officer Hill asked Jose about the purpose of his visit to the United States, to which Jose responded that he intended to go shopping for his mother.

Officer Hill conducted a preliminary search of the vehicle, tapping the driver's rear quarter panel. According to Officer Hill, the panel seemed "solid," so he tapped the vehicle's other quarter panel and then opened the passenger door and searched the inside of the quarter panel. That search uncovered several packages wrapped in electrical tape.

After Officer Hill found the packages in the vehicle's quarter panels, he placed Jose in handcuffs. Officer Hill then patted Jose down, and escorted Jose to a security office. The 4-Runner was taken for a secondary inspection, where agents found that the vehicle contained twenty-five packages that contained 29.68 kilograms (or 65.43 pounds) of cocaine.

Approximately one hour after agents stopped Jose at the border, United States Immigration and Customs Enforcement ("ICE") Agent Eveleen Cabrera questioned Jose. When Agent Cabrera asked Jose if he knew why he was being detained, Jose replied that the agents had told him that he was being detained because they found drugs in the car he brought across the border. Agent Cabrera informed Jose that the agents needed to contact his parents, because he was a minor. Jose responded that his family did not have a telephone, but he gave Agent Cabrera the telephone number of relatives who

lived next door to Jose's family in Mexico. At no time did Agent Cabrera advise Jose of his *Miranda* rights.

Agent Cabrera called the number provided by Jose, and reached his aunt, Maria Del Rosario Llanes-Angulo. Agent Cabrera told Llanes-Angulo that Jose had been detained at the border and that he had been caught trying to smuggle drugs into the United States. She asked if Llanes-Angulo could contact Jose's parents. Llanes-Angulo told Agent Cabrera that Jose's mother was at work and that she did not have access to a phone at her workplace. Llanes-Angulo offered to physically locate Jose's mother. She also said that she did not have a telephone number for Jose's father, who was separated from Jose's mother, but offered to try to track him down as well. She later testified that Jose's father lived about fifteen minutes from her house. Agent Cabrera did not give Llanes-Angulo a callback number to the Port of Entry that might have permitted Jose's parents to reach the agents by phone.

Agent Cabrera asked Llanes-Angulo if she could come to the Port of Entry, to which Llanes-Angulo responded that it would take her an hour and a half to do so.[1] Agent Cabrera also asked Llanes-Angulo if the agents could question Jose and Llanes-Angulo assented.[2] Nonetheless, Agent Cabrera did not inform Llanes-Angulo of Jose's constitutional rights and did not permit Jose to speak to his aunt.

Approximately nine minutes after Agent Cabrera attempted to contact Jose's parents, Special Agent Moises Martinez first

---

[1]Llanes-Angulo testified that she spontaneously volunteered to come to the Port of Entry if she was needed, and she told Cabrera that it would take her an hour and a half to do so. The judge credited the agent's testimony over Llanes-Angulo's.

[2]Llanes-Angulo testified that Agent Cabrera never asked her for permission to question Jose and that Llanes-Angulo did not give such permission. The court found Agent Cabrera's testimony more credible, and concluded that Cabrera had asked for and received Llanes-Angulo's permission to question Jose.

notified Jose of his *Miranda* rights. Agent Martinez gave Jose the *Miranda* warning in Spanish using an ICE Advice of Rights form, which Martinez had Jose read aloud. Jose indicated that he understood each right by signing a statement to that effect. Jose was also informed that, because he was not a United States citizen, he had a right to have the officers notify the Mexican consulate of his arrest and detention. Jose orally waived this right and signed a waiver of the right to consular notification.

After Jose waived his *Miranda* and consular notification rights, Agents Martinez and Edward Zuchelli questioned Jose. According to the agents, they did not wait for Jose's parents to arrive because Jose was a minor and they knew they needed to act quickly in the case of a minor's arrest, and because Jose had been caught with a large quantity of cocaine. The interview lasted thirty to forty-five minutes.

Approximately forty-five minutes after the agents finished interrogating Jose, Agent Zuchelli — at the urging of the United States Attorney — notified the Mexican consulate of Jose's arrest and detention. At about this same time, Jose's father arrived at the Port of Entry. The agents informed Jose's father of the charges against his son, and gave Jose's father a brief opportunity to speak with Jose. They also informed him that Jose was going to be held at the San Diego Juvenile Hall facility. Nothing in the record indicates that the agents informed Jose's father of his son's *Miranda* rights.

### B.   Arraignment

Jose was transported to Juvenile Hall at 9:30 p.m. on May 10, 2005. The following morning at 8:00 a.m., Jose was taken to the courthouse in San Diego and turned over to the United States Marshal Service. The assigned magistrate began arraignments at 10:30 a.m. The Federal Defender, Michelle Villasenor-Grant, met with Jose at 12:55 p.m. Although the magistrate's afternoon session began at 2:00 p.m., Jose was

not brought before the magistrate for arraignment until 3:30 p.m., after all the adults had been arraigned for the day and nearly twenty-four hours after his arrest.

At the arraignment, the government filed a juvenile information charging Jose with being a juvenile delinquent for one count of importation of a controlled substance in violation of 21 U.S.C. §§ 952 and 960. Jose moved to dismiss the information on the ground that his arrest and detention violated the JDA. The court dismissed the motion without prejudice.

## C.   Pre-Trial Motions

On May 23, 2003, Jose filed two motions to dismiss the information based on violations of the JDA. In these motions, Jose argued that the information was deficiently certified by the Attorney General, and that the government did not present Jose to a magistrate for arraignment "forthwith." After argument, the court denied both motions.

In two additional pretrial motions, Jose moved to suppress his custodial statements on the following grounds: (1) that the arresting officers failed to advise his parents of the charges against him or of his constitutional rights as required by the JDA, and that this deprived him of the right to counsel and the protection of his parents; (2) that the officers failed to notify the Mexican consulate of Jose's arrest and detention as required by the JDA; (3) that Jose did not voluntarily, knowingly, or intelligently waive his *Miranda* rights; and (4) that Jose was not taken to a magistrate forthwith in violation of the JDA.

On June 1, 2005, the court considered Jose's pre-trial motion to suppress his statements. The court concluded that Jose had voluntarily waived his *Miranda* rights, but that the government violated the JDA's notification provisions by failing to notify Jose's parents before questioning him. This "technical violation," the court concluded, did not violate

Jose's right to due process. *Id.* The court found, however, that the statements were prejudicial, and therefore excluded Jose's statements from the government's case-in-chief.

## D.   Trial, Conviction, and Sentencing

After a brief bench trial, the district court adjudged Jose a juvenile delinquent on June 2, 2005. Sentencing was set for July 11, 2005.

A Presentence Report ("PSR") was filed on June 17, 2005. According to the PSR, Jose did well in school, never used drugs, and worked on occasion for his father. He had no prior criminal or juvenile convictions. Jose told the probation officer that, while he knew he was involved in some illegal activity, he believed that he was picking up illegal visas in San Ysidro. He stressed that he did not know that the 4-Runner contained illegal drugs, and expressed remorse for getting involved in illegal activity. The PSR concluded that a custodial sentence was not needed to protect the community or to promote a respect for the law. Instead, the Probation Office believed that Jose was "capable of rehabilitation without a custodial sanction," and recommended that Jose be sentenced to five years probation. *Id.* The Probation Office assured the court that such a sentence "[would] not diminish the seriousness of the offense. The juvenile understands the seriousness of his actions and has learned from this experience." *Id.*

Despite the PSR's recommendation, the court sentenced Jose to serve an additional ten months custody in a juvenile detention facility. Given the substantial quantity of drugs involved, the court found that probation was not a deterrent and that the rehabilitative aims of the JDA would best be served by imposing ten months of detention.

Jose filed a timely notice of appeal.

## II.   Discussion

We review compliance with the JDA, a question of statutory interpretation, *de novo*. *See United States v. Male Juvenile (Pierre Y.)*, 280 F.3d 1008, 1014 (9th Cir. 2002). We also review *de novo* "whether the juvenile [was] advised of his rights 'immediately' or whether the juvenile's parents were notified 'immediately' " because such questions "turn on the legal interpretation of 'immediate.' " *United States v. Doe* (*Doe III*), 219 F.3d 1009, 1014 (9th Cir. 2000) (*citing United States v. Frega*, 179 F.3d 793, 802 n.6 (9th Cir. 1999)). Whether a juvenile's parents have been properly notified pursuant to 18 U.S.C. § 5033 is a predominately factual question that is reviewed for clear error. *See United States v. Juvenile (RRA-A)*, 229 F.3d 737, 742 (9th Cir. 2000). Whether a juvenile has been arraigned without unreasonable delay is a mixed question of law and fact reviewed *de novo*. *See Doe III*, 219 F.3d at 1014.

Section 5033 of the Juvenile Delinquency Act ("JDA") provides:

> Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.

18 U.S.C. § 5033. In reviewing Jose's claim, the panel must first "address whether the government violated the requirements of the Juvenile Delinquency Act." *United States v. Doe* (*Doe II*), 862 F.2d 776, 779 (9th Cir. 1988). If the government violated the JDA, then the panel should consider "whether the

government's conduct was so egregious as to deprive [Jose] of his right to due process of law." *Id*. If it was not, the panel then considers whether "the violation [was] harmless to the juvenile beyond a reasonable doubt." *Id*.

## A.   Was the JDA violated?

Jose contends that the Border Patrol agents and officers failed to comply with the JDA because (1) the agents did not immediately advise him of his constitutional rights; (2) the arresting officer improperly delegated the duty to notify Jose's parents of his arrest, detention, and constitutional rights; (3) the agents did not immediately notify Jose's parents that he was in custody and never advised Jose's parents of Jose's constitutional rights; (4) the agents did not notify the Mexican consulate before Jose was interrogated; and (5) the government did not present him before a magistrate "forthwith." The government bears the burden of showing compliance with the JDA. *See id.* at 779.

### 1.   Was Jose immediately advised of his rights?

Jose was considered "in custody" from the moment Officer Hill handcuffed him at approximately 4:15 p.m. *See RRA-A*, 229 F.3d at 744 (finding juvenile "in custody" from the moment he was handcuffed). Jose was not informed of his *Miranda* rights until 5:24 p.m, when Agent Martinez began to interrogate him. In this appeal, Jose argues that the arresting officers violated the JDA because he was not *immediately* notified of his *Miranda* rights.

**[1]** "[T]here is a dearth of case law interpreting 'immediately' in the context of 18 U.S.C. § 5033." *Doe III*, 219 F.3d at 1014. In *Doe III*, this court found that a delay of three and a half hours was untimely because the plain meaning of the term "immediately" does not countenance a three and a half hour delay, and because there was no showing "that exigent circumstances or other valid reasons caused the delay." *Id.* In

another juvenile case, *RRA-A*, we found that a delay of four hours was not "immediate." *RRA-A*, 229 F.3d at 744.

[2] The delay at issue here is less than the delay in either of our previous cases on this question. And yet the notification here was certainly not "immediate." Officer Hill did not advise Jose of his rights when Jose stood handcuffed at the border or when Jose was transported to the security office. Agent Cabrera did not advise Jose of his rights before she asked Jose why he thought he was in custody or before she solicited contact information. It appears that both agents spoke Spanish, and there was no valid reason presented why either of these two agents could not have informed Jose that he did not have to speak to the agents, or that he would be permitted the aid of counsel. Legal warnings need not be given instantaneously, especially where "exigent circumstances or other valid reasons" cause a short period of delay. *Doe II*, 219 F.3d at 1014. But it stretches the language of the statute too far to say that "immediately" means "just before you wish to seek a confession." *Miranda* itself provides the right to receive such warnings before being interrogated, *see Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), and to find otherwise would render the JDA's protection for juveniles superfluous. We believe that Congress intended juveniles to be advised of their *Miranda* rights as soon as practicable after the juvenile was "in custody."

[3] Under this rubric, Jose was not advised of his *Miranda* rights "immediately." At the very least, Agent Cabrera should have read Jose his rights before she asked Jose if he knew why he was being detained, and before she began the other tasks assigned to her by the JDA. *See RRA-A*, 229 F.3d at 746 (noting that arresting officer should read the juvenile his *Miranda* rights but delay interrogation of the juvenile until the consulate can be notified). Accordingly, we find that the government violated the JDA by failing to "immediately" notify Jose of his legal rights.

*2.   Did the arresting officer improperly delegate the notification of duties?*

**[4]** Jose contends that the Border Patrol agents violated the JDA when Agent Hill, as the arresting officer, "delegated" the notification duty to Agents Cabrera and Zuchelli. In support of this argument, Jose cites *RRA-A*, in which we found a JDA violation where the arresting officer delegated the notification requirement to the United States Attorney's Office. *RRA-A*, 229 F.3d at 745. We find that Agent Hill did not improperly delegate the notification duty.

In *RRA-A*, the officer delegated the task of parental notification to the prosecutor, who subsequently delegated the task to the prosecutor's secretary. *See id.* at 745. We concluded that delegation to a prosecutor strayed too far from the textual strictures of the JDA, which requires that the "arresting officer" notify the parents. *See id.* at 744-45; *see also United States v. Doe (Doe IV)*, 170 F.3d 1162, 1167 (9th Cir. 1999) (finding that the text of the JDA does not allow for delegation to a "subsequent official who might handle the judicial phases of the matter").

**[5]** Nonetheless, it seems an overly narrow reading of "arresting officer" to exclude fellow officers and agents involved in the actual arrest and investigation at the scene of the arrest. In this case, Agent Hill was working at the border and conducted the initial investigation, after which he walked Jose back to the office so that a fellow agent could conduct initial processing. We believe that the purpose of the JDA was not thwarted by allowing an intake officer on the scene of the arrest to call the juvenile's parents instead of the officer who made the initial arrest. Accordingly, we conclude that Agent Hill did not improperly delegate his notification duties in violation of the JDA.

### 3.  Were Jose's parents immediately notified that he was in custody and notified of his rights?

**[6]** Section 5033 requires that federal law enforcement agents notify parents of a juvenile's arrest "immediately" after the juvenile is taken into custody. *See United States v. Female Juvenile (Wendy G.)*, 255 F.3d 761, 765 (9th Cir. 2001). In addition, a juvenile's parents must also be notified of the minor's *Miranda* rights, "to ensure that § 5033 provides juveniles with 'meaningful protection.' " *RRA-A*, 229 F.3d 745. Because this protection is useless unless the parent has the right to consult with the juvenile before interrogation, the arresting officer must affirmatively inform the parents that they will have the opportunity to confer with and to advise their child before the child is interrogated. *See Wendy G.*, 255 F.3d at 767. If notification is not immediately possible, the officers must delay interrogation for a reasonable time to allow parental notification and response. *See RRA-A*, 229 F.3d at 746. These steps ensure that a juvenile in custody receives "the aid of more mature judgment as to the steps he should take in [his] predicament," that is, an adult who can provide the juvenile "the protection which his own immaturity could not." *United States v. Male Juvenile*, 121 F.3d 34, 43 (2d Cir. 1997) (quoting *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962)).

**[7]** When the juvenile's parents live outside the United States, the government must make "reasonable" efforts to contact the parents so that the juvenile can receive such protection. *See Doe II*, 862 F.2d at 779. "These reasonable efforts may consist of either (a) actual notification or (b) sufficient inquiry or effort to make the reasonable determination that actual notification is not feasible" *Id.* Only if actual notification is not feasible may the government notify a foreign consulate in this country in lieu of parental notification. *See id.* Consular notification facilitates parental notification, allowing an "in-country mechanism" to assist the government in locating the parent. *RRA-A*, 229 F.3d at 746. It also allows a coun-

try's diplomatic officers to become involved as surrogates for the parents. *See id.*

**[8]** The government contends that it made "every effort" to comply with these notification provisions. We disagree. Government agents notified Llanes-Angulo that Jose had been detained at the border, but that was the extent of their compliance with the JDA. Llanes-Angulo offered the agents a number of options, any of which probably would have complied with the JDA: The agents could have asked Llanes-Angulo to locate the mother or father and could have left a callback number so either parent could call and talk to their son. The agents could have clarified whether Llanes-Angulo intended to come to the border, and could have waited an hour and a half to allow Llanes-Angulo to travel to the border and to consult with her nephew.[3] The agents also could have informed Llanes-Angulo that Jose had been caught at the border with cocaine, informed her of Jose's *Miranda* rights, and offered her an opportunity to talk with her nephew.[4] Arguably, any of

---

[3]Llanes-Angulo stated that she told officers she *would* come to the border, whereas the agents stated that Llanes-Angulo stated that she *could* come to the border within an hour and a half, but did not make clear whether she intended to do so or not. For purposes of analysis, this matters little. The government bears the burden of showing compliance with the JDA and must show that it made reasonable efforts to contact the foreign juvenile's parents and that parental notification was not feasible. *See Doe II*, 862 F.2d at 780. Therefore, the government agents should have affirmatively clarified whether Llanes-Angulo would notify the mother or father, or whether Llames-Angulo would come to the border.

[4]This presumes that Llanes-Angulo was a responsible adult who the officers reasonably believed could act *in loco parenti*. The JDA requires that either a "parent, guardian or custodian" be notified. 18 U.S.C. § 5033. We have said that notification of a juvenile's sister, where the sister spoke English and apparently translated for the non-English speaking parents, might substitute for parental notification. *See Doe III*, 219 F.3d at 1012, 1014-15. While we presume, for purposes of analysis, that the aunt was competent to act in lieu of Jose's parents, we note that this requirement must also be read in light of the purposes of the JDA: to ensure that the juvenile is not left alone in a strange environment without advice and com-

these options would have fulfilled the JDA's requirement that a parent, or person who could reasonably be deemed to act *in loco parenti*, be notified of the juvenile's situation, be informed of the juvenile's *Miranda* rights, and be affirmatively offered the opportunity to consult with the juvenile. Instead, agents waited nine minutes — hardly a "reasonable time" to allow parental notification — and then began interrogating Jose.[5] We believe the government spurned obvious alternatives that would have permitted Jose to consult with his mother or father, or at least with his aunt. As such, the government has not borne its burden to show that actual parental notification was not feasible. We therefore find a violation of the JDA.

The government claims that this failure to notify Jose's parents was somehow remedied by the fact that Jose waived his right to consular notification. Given that the government has not shown that parental notification was not feasible, consular notification is irrelevant. Consular notification is undertaken in lieu of parental notification, but it can never fully supplant parental notification. Consular notification should not be used simply because parental notification is inconvenient.[6]

---

fort of a responsible adult who can provide guidance. Giving the *Miranda* warning to a family member or friend who cannot provide the necessary assistance thwarts the purpose of the act. Indeed, in this case, the aunt declared under oath that she would not have felt comfortable making any decision about whether Jose could be interrogated because she was not his parent. Because the government violated the JDA by failing to provide Llanes-Angulo with the *Miranda* warning, we need not decide whether Llanes-Angulo was competent to act in lieu of Jose's parents.

[5]The Government claimed that it had to proceed expeditiously and could not wait before interrogating the minor because of the quantity of cocaine that was involved. This assertion is undercut somewhat by the officer's statement that he handled this case the same way that he had handled ten to fifteen other juvenile cases.

[6]We further note, because this situation is likely to recur, that it is highly doubtful that a juvenile can waive consular notification. This court

### 4. Was Jose taken to a magistrate forthwith?

**[9]** Jose next contends that the twenty-three hour delay between his arrest and his arraignment violates the JDA's requirement that a juvenile be presented to a magistrate "forthwith." As stated above, Jose was taken into custody at approximately 4:15 p.m. on May 10, 2005. He was interrogated from approximately 5:24 p.m. to 6:10 p.m. He was then transported to Juvenile Hall at 9:30 p.m. The following morning, at 8:00 a.m., Jose was taken to the courthouse in San Diego and turned over to the United States Marshal Service. Michelle Villasenor-Grant, the Federal Defender and the assigned "duty attorney" on May 11, was present at the courthouse from 9:00 a.m. The assigned magistrate began arraignments at 10:30 a.m. When Villasenor-Grant overheard the Assistant United States Attorney speaking about a juvenile who had been detained, Villasenor-Grant took affirmative steps to find Jose. She met with Jose at 12:55 p.m., and was ready to proceed at 1:10 p.m. The magistrate's afternoon session began at 2:00 p.m., and still, Jose was not arraigned. At 3:30 p.m., after the entire adult calendar was finished, Jose was finally brought before the magistrate for arraignment — nearly twenty-four hours after his arrest.

has held that a juvenile cannot waive the right to parental notification. *See United States v. L.M.K.*, 149 F.3d 1033, 1035 (9th Cir. 1998) (concluding that § 5033 "does not permit the juvenile to waive notification of the parents"). The role of consular notification is to permit "diplomatic officials to become involved *as surrogates* for parents who are not in the country." *RRA-A*, 229 F.3d at 746 (emphasis added). It stands to reason that if a juvenile cannot waive the right to parental notification, the juvenile cannot validly waive the right to consular notification. Indeed, there is even a greater reason not to allow a waiver of consular notification. A juvenile will intuitively grasp the significance of parental notification, but a juvenile is less likely to understand the important role of the consulate as surrogate. Where the statute does not permit waiver of the right to parental notification, we see no reason that a measure intended to supplant parental notification could be waived.

The government admits, as it must, that the delay was caused by its own processing. The magistrate began arraignments at 10:30 a.m. The public defender was present all day and could have met with Jose that morning if she had been informed that Jose was in custody. Thus, the government proffered only three reasons why Jose could not be arraigned in the morning: because of the large quantity of the drugs found in Jose's vehicle, because the paperwork involved in preparing the information was "tedious," and "because this case was urgent requiring a thorough, cautious approach."

**[10]** We have held that, in general, juveniles in custody should be given priority in the arraignment schedule. *See United States v. Doe I*, 701 F.2d 819, 824 (9th Cir. 1983). In *Doe I*, we upheld a thirty-six hour delay where the magistrate was unavailable and where agents had to give priority to other cases, including the arraignment of a pregnant woman and women with small children. *See id.* We held that "*only* because of these exigencies" was the delay in arraignment permissible. *Id.* (emphasis added)*; see also Doe III*, 219 F.3d at 1015 (finding that thirty-one and a half hours is not "forthwith"). In contrast to the specific reasons offered for delay in *Doe I*, here we have only the government's assertion that they were proceeding "with caution" and that the paperwork process was "tedious." We refuse to accept the government's bald assertion that caution was required to justify detaining Jose in the holding cell for almost seven and a half hours after he arrived at court.

The Government also argues that Jose's waiver of his *Miranda* rights necessarily permits a delay for the time of interrogation, relying on *United States v. Indian Boy X*, 565 F.2d 585 (9th Cir. 1977). Even if we were to permit a reasonable period of delay for purposes of interrogation, it would not excuse the additional twenty-one hour delay *after* interrogation was completed before Jose was presented to the magistrate.

**[11]** Rather than being treated with priority, Jose was arraigned after the magistrate judge had finished his entire calendar of adult arraignments. We find no reasonable cause for the twenty-three hour delay in proceedings before a magistrate, and therefore that the government violated the JDA when it failed to present Jose to a magistrate forthwith.

## B.   Due Process Violation

**[12]** Because we find that government officials committed multiple violations of the JDA, we must consider whether these violations were "so egregious as to deprive [the juvenile] of his rights to due process." *Doe II*, 862 F.2d at 779. We conclude that, under our case law, those multiple violations of the JDA did not amount to a violation of due process. The delay in reading Jose his *Miranda* rights did not effect a violation of due process, because Jose was read his rights before interrogation, and thus the "primary purpose" of *Miranda* — to protect against self-incrimination — was secured. *See RRA-A*, 229 F.3d at 746. This court has also held that the failure to properly notify a juvenile's parents or the failure to notify a foreign minor's consulate does not, in and of itself, require suppression of the juvenile's statement on due process grounds. *See RRA-A*, 229 F.3d at 746; *Doe IV*, 170 F.3d at 1168.

**[13]** Similarly, this court has found that delay in bringing a juvenile before a magistrate does not violate due process where the government made no attempt to interrogate the juvenile during the delay and where there was no evidence that the delay was a deliberate attempt to gain undue advantage or influence the juvenile. *See Doe III*, 219 F.3d at 1016. In this case, although the delay was significant, there is no evidence that the government tried to use the delay to its advantage or that the delay was undertaken in bad faith. Thus, we find, as did the district court, that the delay in bringing Jose before the magistrate for arraignment did not, in the cir-

cumstances presented, affect the fundamental fairness of the proceeding.

## C.   Harmless Error

While "[t]he [JDA] was enacted to protect juveniles' due process rights, [it] is not coextensive with constitutional guarantees." *Doe II*, 862 F.2d at 781. Thus, even if the government's violations of the JDA did not violate Jose's right to due process, we must next consider whether Jose was prejudiced by the JDA violations and whether the court should exercise its discretion and dismiss the information to "ensure that the 'prophylactic safeguard for juveniles [is not] eroded or neglected.' " *RRA-A*, 229 F.3d at 744; *see also Doe II*, 862 F.2d at 781.

The government law enforcement agents flagrantly violated the JDA in this case. Congress enacted the JDA to protect the rights of juveniles: to ensure that juveniles can consult with their parents before being interrogated so that they do not " 'become the victim[s] of fear, then of panic.' " *Doe IV*, 170 F.3d at 1167 (citations omitted). We have noted that, particularly in the case of foreign juveniles, "the potential discombobulation may be even more resonant due to language differences and an exacerbated sense of isolation and helplessness." *Id.* And yet, over thirty years after the JDA was enacted, government law enforcement agents trample even the most basic requirements of the JDA. Indeed, the government attorney claimed, at trial, that the agents went "above and beyond the call of duty" in their attempts to notify Jose's parents. We do not believe that it furthers Congress's intent to allow the government, in case after case, to ignore with impunity the protective requirements of the JDA. *See, e.g.*, *United States v. Doe*, 366 F.3d 1069 (9th Cir. 2004) (finding a violation of JDA, but excusing the error as harmless); *Pierre Y.*, 280 F.3d 1008 (same); *L.M.K.*, 149 F.3d 1033 (same); *United States v. Doe*, 149 F.3d 945 (9th Cir. 1998) (same); *United States v. Lyndell N.*, 124 F.3d 1170 (9th Cir. 1997) (same);

*Doe I*, 701 F.2d 819 (same). Courts should not close their eyes to these continuing violations by mindlessly reciting the rubric of harmless error as an overarching excuse for ignoring what Congress has clearly ordained; instead we must carefully examine the possible prejudicial effect of each violation with an eye toward the prophylactic purposes of the JDA.

[14] We appreciate thus the district court's careful analysis of the prejudice question. The district court was correct that the delay in bringing Jose before the magistrate did not effect any prejudice. The court also properly suppressed, at trial, Jose's statement, because it found that the failure to properly notify Jose's parents was prejudicial, in that it "caused" him to make his statement. The district court failed to consider, however, whether the indictment itself might not have been filed but for Jose's statement. We must determine whether that error was harmless beyond a reasonable doubt. *See Doe II*, 862 F.2d at 781. We have held that a violation of the JDA may not be harmless (a) where the isolation stemming from a violation of the JDA led a juvenile to confess, and (b) where criminal proceedings were initiated on the basis of the juvenile's confession. *See id.* If a violation of the JDA was prejudicial because it led the Government to initiate prosecution of the juvenile, the remedy is for the charges against the juvenile to be dismissed. *See id.*[7]

---

[7]Although our dissenting colleague disputes the *Doe II* court's holding on these points, *Doe II* is, nonetheless, this circuit's law. Indeed, the Government itself argued that the standard for prejudice was "beyond a reasonable doubt." Appellee Reply Br. at 25 ("This Court must address the third prong of the *Doe II* analysis: Were the statutory violations harmless to Jose A. beyond a reasonable doubt?"). *Hulteen v. AT&T Corp.*, 441 F.3d 653, 658 (9th Cir. 2006), dealt with whether a panel could disregard prior precedent based on a so-called "sea change" in the law that occurred *after* that prior precedent was handed down. No such intervening Supreme Court decision or statute has called *Doe II* into question — certainly not *United States v. Morrison*, 449 U.S. 361 (1981), decided seven years before *Doe II*. We are therefore bound to apply *Doe II* as the law of the circuit.

**[15]** The first question — whether violations of the JDA led, in part, to Jose's confession — must be answered in the affirmative. The district court excluded Jose's statement from evidence at trial, and thus, must have found that the violations "caused" the confession. We agree with the district court that in this case, as in *Doe II*, the failure to properly notify Jose's parents likely caused his confession because it "needlessly isolated [Jose] in a strange environment and deprived him of support and counsel during the pre-arraignment period." *Doe II*, 862 F.2d at 781. Jose was forced to make important decisions — whether to waive his right to counsel and whether to speak to the government agents — without the aid of "more mature judgment." *Male Juvenile*, 121 F.3d at 43. Thus, we believe the district court was correct to conclude that the violations of the JDA caused, at least in part, Jose's confession.

**[16]** The second question — whether Jose's prosecution resulted from his confession — is more difficult. While the district court believed that the statements were prejudicial and excluded them at trial, the court never considered whether Jose's statements were the basis of the indictment itself. When the juvenile information was filed, Jose's statements were the *only* evidence provided by the government to show that Jose "knowingly" committed a crime, as required under 21 U.S.C. § 960(1). The record is silent as to what other evidence the government could have produced at the time the juvenile information was filed to prove up the essential element of knowledge. We have held that where the record does not satisfy us, *beyond a reasonable doubt*, that a violation of the JDA was harmless, a remand to the district court is appropriate. *See Doe II*, 862 F.2d at 781. We thus remand this case to the district court to determine whether it is clear beyond a reasonable doubt that, at the time the juvenile information was filed, the government's use of Jose's confession to prove up the indictment on the essential element of knowledge was harmless.[8]

---

[8]We acknowledge that the government went on to prove at trial — without the aid of Jose's confession — that Jose knowingly committed the

## III.  Conclusion

For the foregoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

ALARCÓN, Circuit Judge, concurring and dissenting:

I concur in the Majority's holding that the Government did not egregiously deprive Jose of his right to due process in delaying to advise him of his *Miranda* rights and in failing to bring him before a magistrate judge "forthwith." Majority Op. at 7212.

I respectfully dissent from the Majority's puzzling and contradictory determination that "[t]he government law enforcement agents flagrantly violated the JDA in this case," Majority Op. at 7213, but that their conduct "did not, in the circumstances presented, affect the fundamental fairness of the proceedings." Majority Op. at 7212-13.

Respectfully, I cannot join the Majority's number because (1) it has failed in its duty to view the evidence in the light most favorable to the prevailing party, and (2) it has ignored this Circuit's harmless error standard of review for JDA violations and instead, fashioned a prejudicial *per se* standard that is applicable even to a good faith and harmless failure to com-

---

crime. The question here is different: whether, *at the time the information was filed*, the government could produce enough evidence to indict Jose for a crime that required knowledge. We are not, as the dissent charges, making our own factual and credibility findings. Even if we accept the evidence in the light most favorable to the judge's findings at trial, there was simply no inquiry made on this critical issue during the district court's hearing. Because we cannot conduct this inquiry with any certainty and because the district court never specifically considered whether the confession "caused" the government to initiate its prosecution, we remand.

ply with the JDA. Under the law of this Circuit, violations of the JDA are reviewed under the harmless error standard. A three-judge panel cannot overturn the law of this Circuit. *See Taylor v. Burlington Northern R.R. Co.,* 787 F.2d 1309, 1313 (9th Cir. 1986) (explaining that a three-judge panel must follow Ninth Circuit precedent). I would affirm the District Court's well-reasoned conclusion that the agents' "technical violation" of the JDA was not egregious, and, therefore, the agents' failure to comply with its requirements was not prejudicial. I would not remand this matter for an evidentiary hearing to determine whether the information should be dismissed. In so holding, the Majority has violated the Supreme Court's express holding in *United States v. Morrison*, 449 U.S. 361, 365 (1981) that dismissal of an accusatory pleading is not a proper remedy where statements obtained from an accused must be excluded. The District Court did not consider any evidence obtained in violation of the JDA in finding that Jose was guilty of importing cocaine into the United States. The Majority has also erred in directing the District Court to apply a proof beyond a reasonable doubt standard upon remand in determining whether the alleged nonconstitutional error was harmless.

# I

Because the Majority has, contrary to the law of this Circuit, improperly insinuated its own factual and credibility findings in its summary of the evidence, I will set forth the evidence presented to the District Court in the light most favorable to the Government as the prevailing party. *See United States v. Cluchette*, 465 F.2d 749, 754 (9th Cir. 1972) ("It is not our function to re-weigh the evidence and pass on the credibility of the witnesses."); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.");

*Minidoka Irrigation Dist. v. Dep't of Interior*, 406 F.3d 567, 572 (9th Circuit 2005) (stating that "in reviewing [a] district court'[s] findings of fact for clear error, we must view the evidence in the light most favorable to the prevailing party") (internal quotations and citation omitted).

Mark Hill testified that he was a primary inspector with the United States Customs and Border Protection ("CBP"). At 4:16 p.m. on May 10, 2005, Officer Hill was on duty at the San Ysidro, California Port of Entry inspecting vehicles entering the United States. At that time, a gray Toyota 4-Runner with Mexican license plates approached Officer Hill's lane for inspection. The vehicle was driven by Jose, a fifteen-year-old juvenile. Jose immediately handed Officer Hill a Mexican border crossing card before he was asked for identification.

Officer Hill asked Jose who owned the vehicle. Jose first responded that he was the owner. A couple of seconds later, he stated that the vehicle belonged to his uncle. Because of his contradictory statements, Officer Hill asked Jose for the vehicle registration. Jose reached into the glove compartment and extracted what appeared to be a vehicle registration. Before the document was handed to Officer Hill, Jose was asked to disclose his uncle's name. Jose looked at the vehicle registration and replied: "Daniel."

Officer Hill asked Jose why he was entering the United States. He replied that he was going shopping for his mother. When asked whether he was transporting anything into the United States, Jose replied: "Nothing."

Officer Hill testified that during this conversation, Jose's "mouth appeared to get dry and he moved his eyes around a lot." Based on Jose's responses and his demeanor, Officer Hill decided to inspect the vehicle. After obtaining the keys to the vehicle from Jose, Officer Hill tapped on the rear quarter panel on the driver's side. It emitted an extremely solid sound. Based on his law enforcement experience, the door

panel's condition indicated to him that there was something hidden inside the quarter panel. Officer Hill next tapped the quarter panel on the passenger's side. It also felt solid.

Officer Hill removed one of the panels with a screw driver and discovered square or rectangular packages inside. He then placed handcuffs on Jose. Officer Hill patted down Jose. Officer Hill did not find any money, an ATM card, or credit cards in Jose's possession. This was significant to Officer Hill because Jose had stated that he had entered the United States to go shopping for his mother. Officer Hill escorted Jose to the security office and turned the vehicle over to Officer Rodrigo Lopez. As Jose walked to the security office, he appeared "somber." He was not interrogated further by Officer Hill.

Officer Rodrigo Lopez testified that he was a customs officer with the CBP. On May 10, 2005, Officer Lopez was assigned to the secondary inspection lot at the Port of Entry. Officer Lopez inspected the quarter panels of the vehicle driven by Jose. He observed packages wrapped in black electrical tape. He then drove the vehicle to an x-ray area to determine whether there was contraband in any other part of the vehicle. Officer Lopez poked one of the packages and discovered that it contained white powder. He tested the powder. It tested positive for cocaine. Officer Lopez removed twenty-five packages from the vehicle. The total weight of the packages was 29.68 kilograms, or 63.3 pounds.

Maurice Wrighten testified that he was a Special Agent with Immigration and Customs Enforcement ("ICE"). He was assigned to investigate narcotics smuggling into the United States. Special Agent Wrighten was qualified as an expert regarding the retail or street value of cocaine. He testified that in San Diego, the retail value of the cocaine seized from the vehicle for personal use was $2,371,696.

Agent Eveleen Cabrera testified that she is employed by ICE as a criminal investigator. At the time of the trial, she had

served in that capacity for approximately a year and a half. On May 10, 2005, she was assigned to the Port of Entry. At 5:15 p.m., she was requested to notify Jose's parents, his guardian, or his custodian that he had been arrested as he entered the United States. When she met Jose, he was sitting in the security office. He was not in handcuffs.

Agent Cabrera asked Jose if he knew why he was being detained. He replied that the inspectors told him that they had found drugs in the vehicle he was driving. Agent Cabrera then told Jose that because he was a minor, she was required to contact his parents. Agent Cabrera asked him for his parents' phone number. Jose replied that his family did not have a telephone. He gave Agent Cabrera his cousin's telephone number in Mexico.

When Agent Cabrera dialed that number, Maria Del Rosario Llanes-Angulo ("Ms. Llanes-Angulo") answered the call. She identified herself as Jose's aunt. Agent Cabrera informed Ms. Llanes-Angulo that Jose was being detained for bringing drugs into the United States. Agent Cabrera asked Ms. Llanes-Angulo if she could contact Jose's mother or father. Ms. Llanes-Angulo replied that Jose's mother was at work and did not have access to a telephone. She told Agent Cabrera that she would try to contact Jose's mother at her work place. Ms. Llanes-Angulo told Agent Cabrera that she did not know how to contact Jose's father because his parents had separated. She promised to try to track him down.

Agent Cabrera asked Ms. Llanes-Angulo if she could come to the Port of Entry. Ms. Llanes-Angulo stated that she lived far away and "it would take her an hour and a half to even get there." Agent Cabrera asked Ms. Llanes-Angulo if it would be okay for the agents to talk to Jose. She replied: "[Y]es." Agent Cabrera asked Ms. Llanes-Angulo to come to the Port of Entry, if she failed to contact Jose's parents.

Agent Cabrera testified on cross-examination that she had handled ten to fifteen other investigations in which a juvenile

was involved. In each of those cases, the procedure she followed was similar to the one she followed in this matter. That procedure consisted of determining whether it was necessary to notify the juvenile of the nature of the offense that resulted in his or her arrest, and to elicit the names of his or her parents, guardian or custodian in order to notify them of the arrest or detention of the minor. It was fully consistent with the requirements of § 5033 of the JDA.

Agent Cabrera testified that the only involvement she had in this matter was to determine whether Jose was aware of the reason for his detention, and to make the telephone call to Ms. Llanes-Angulo. Her work in this matter was complete after she attempted to contact Jose's parents. She did not participate in the interrogation of Jose after he waived his *Miranda* rights or in transporting him to a magistrate judge for arraignment.

Contrary to the Majority's factual finding, Agent Cabrera did not interrogate Jose. She merely asked him if he knew why he was being detained. His response that the inspectors told him that they had found drugs in the vehicle he was driving made it unnecessary to notify him why he was being detained. She did not inquire further about his alleged criminal activity. Jose's statement to her was not incriminating. It was based on hearsay. Its admissibility at trial on the issue of guilt would have been doubtful because it merely reflected what he had been told by the inspectors. It was not an admission that he was aware that he was smuggling drugs into the United States. The Government did not file a cross-appeal challenging the District Court's interpretation of § 5033 and the order suppressing Jose's statements to the agents. Accordingly, this Court need not decide whether the suppression order was valid in light of Agent Cabrera's unsuccessful attempt to notify Jose's parents because they had no telephone.

Edward Zuchelli testified that he was an ICE case agent assigned to investigate whether Jose should be charged with

smuggling cocaine into the United States. Shortly after 5:00 p.m., he spoke to Agent Cabrera. She told him Ms. Llanes-Angulo was not able to get to the Port of Entry for an hour and a half.

Moises Martinez testified that he was a Special Agent assigned to the ICE. He testified that Jose read the *Miranda* rights aloud in Spanish at approximately 5:24 p.m. Special Agent Martinez asked Jose to initial the notification of rights form if he understood the constitutional rights set forth therein. Jose signed a waiver of his *Miranda* rights that was also in Spanish. Jose also signed a waiver of his right to require the agents to notify the Mexican consulate of his arrest or detention. Nevertheless, the agents notified the Mexican Consulate by facsimile at 7:06 p.m. that Jose had been detained at the Port of Entry. Nine minutes after Jose waived his *Miranda* rights, the agents interrogated Jose for twenty-five to thirty minutes. During this conversation, Jose's right hand was free, but his left wrist was handcuffed to a metal pole on the table for the safety of the officers pursuant to the agency's procedures. Jose's father arrived at the security office at 7:26 p.m., after the agents had completed questioning Jose.

Agent Zuchelli testified that they had not waited for Ms. Llanes-Angulo or Jose's parents to arrive before questioning Jose because "[s]ince we're dealing with a minor things had to be done expeditiously. Also the nature of the drugs — when I found out it was cocaine — it was a substantial amount of cocaine and I also had to proceed quickly." During cross-examination, Agent Zuchelli also stated that he did not wait for an hour and a half before questioning Jose because it was necessary "to speed up the process being the juvenile has to be dealt with forthwith."

The record shows that Agent Zuchelli has handled approximately four cases involving juveniles prior to questioning

Jose. Agent Zuchelli was not asked to describe the procedure he had previously followed in cases involving juveniles.

The Majority states that "the government law enforcement officers flagrantly violated the JDA in this case." Majority Op. at 7213. The Majority has also found that "government law enforcement agents trample even the most basic requirements of the JDA." Majority Op. at 7213.

In a later passage, the Majority states: "We do not believe that it furthers Congress's intent to allow the government, in case after case, to ignore with impunity the protective requirements of the JDA." Majority Op. at 7213. My dictionary instructs me that "impunity" means: "Exemption from punishment or penalty." *Oxford English Dictionary* (2d ed. 1989). The record shows that the District Court did not allow the failure of Agent Cabrera to notify Jose's parents to go unpunished. Citing *United States v. Doe*, 862 F.2d 776 (9th Cir. 1998) ("*Doe II*"), the District Court suppressed each of Jose's statements because of Agent Cabrera's "technical violation of 5033" in failing to notify his aunt of his constitutional rights.

The Majority's attempt to discredit Agent Zuchelli's testimony by relying on the conduct of other officers in prior cases, who were not involved in the interrogation and processing of Jose through the Court system, violates the principle that appellate judges lack the power to weigh credibility or decide factual issues. *Cluchette*, 465 F.2d at 754. It also has ignored the rule that appellate judges must construe the record in the light most favorable to the party that prevailed in the trial court. *Jackson*, 443 at 319. Instead of construing the evidence and the District Court's findings that the violation of the JDA by Agent Cabrera was "technical" and that Jose's statement was voluntary, the Majority has found that the officers' conduct in this case was flagrant and trampled on his rights with impunity. The Majority has improperly acted as a trier of fact in reviewing the testimony of the witnesses in this

matter and in going outside the record in considering the con-
duct of other officers in unrelated cases to bolster its findings.

## II

The District Court denied Jose's motion to dismiss the
information on the ground that Jose was not taken to a magis-
trate judge "forthwith" as required by § 5033. I agree with the
Majority's conclusion that the delay in bringing Jose before
a magistrate judge was not so egregious as to deprive Jose of
his constitutional right to due process. Majority Op. at 7212.
I also agree with the Majority that "there is no evidence that
the government tried to use the delay to its advantage or that
the delay was undertaken in bad faith." Majority Op. at 7212.

I strongly disagree with the Majority's conclusion that the
District Court held that the failure of Agent Cabrera to notify
Jose's parents of his arrest was prejudicial. In suppressing
Jose's statements, the District Court reasoned as follows:

> In this case, the Court concludes that there was a
> violation of 5033 by the testimony of both the aunt
> and Agent Cabrera. Nobody notified the custodian,
> the aunt or parents of the rights of the juvenile prior
> to questioning. They were notified of the circum-
> stances involving drugs, but it does require a notifi-
> cation of rights. Now the Court having concluded
> that there was a *technical* violation of §5033, the
> question then becomes what is the remedy?

Tr. of Motion Hearing/Court Trial at I-83, June 1, 2005
(emphasis added).

The Majority has summarized the District Court's rationale
for suppressing Jose's statements as follows: "The court also
properly suppressed at trial, Jose's statements, because it
found the failure to properly notify Jose's parents was preju-

dicial, in that it 'caused' him to make his statement." Majority Op. at 7214.

The District Court did not find that the failure to notify Jose's parents was prejudicial because it caused Jose to make a statement. In fact, the record shows that the District Court found that the violation was "technical" and that "the statement that the juvenile made was voluntary under the totality of the circumstances." Tr. of Motion Hearing/Court Trial at I-85. The District Court also stated: "[I]f the juvenile elects to testify, then, because I don't think it's a due process violation, I think that the statement was voluntary. Then if the juvenile elects to testify, you may examine the juvenile about any statements made." *Id*.

In support of its analysis of the impact of the officer's technical violation of Jose's *statutory* rights, the Majority finds that "over thirty years afer the JDA was enacted, government law enforcement agents trample even the most basic requirements of the JDA." Majority Op. at 7213. In a later passage, the Majority states "[w]e do not believe that it furthers Congress's intent to allow the government, in case after case, to ignore with impunity the protective requirements of the JDA." *Id*.

There is no evidence in the record that supports the Majority's factual finding that the officers acted in this matter with impunity or that they trampled on the protective requirements of the JDA for over thirty years. Instead of citing testimony in this case to support its factual findings, the Majority mysteriously relies on the testimony presented in five cases decided by this Circuit in which the record apparently showed JDA violations. It should be noted, however, that the failure of the officers to follow the JDA was found to be harmless in each of these cases. The conduct of the officers found to be harmless in the cases cited by the Majority cannot logically be relied upon as proof that the agents in this case flagrantly

trampled on Jose's JDA rights without fear of being punished or sanctioned for their conduct.

The most alarming aspect of the Majority's opinion is its refusal to apply the law of this Circuit which clearly provides that we must affirm if a juvenile fails to demonstrate that he or she was prejudiced as a result of the failure of law enforcement officers to comply with the JDA. Instead, it has created a new rule that a violation of the requirements of § 5033 is prejudicial *per se*. The Majority has cited five decisions of this Court that provide that we must apply the harmless error standard of review when law enforcement officers fail to follow the requirements of the JDA. Majority Op. at 7213-14. It has defiantly declined, however, to follow the law of this Circuit as set forth in the cited cases. The Majority excuses its recalcitrance by stating: "Courts should not close their eyes to these continuing violations by mindlessly reciting the rubric of harmless error as an overarching excuse for ignoring what Congress has clearly ordained." Majority Op. at 7214. What the Majority airily dismisses as "rubric" is the law of this Circuit. A three-judge panel of this Court is required to follow the law of the Circuit. *Taylor,* 787 F.2d at 1313. The Majority has failed to demonstrate that the agents' good faith attempt to comply with the JDA was egregious or prejudicial.

## III

### A

Notwithstanding its determination that the officers did not act in bad faith in failing to comply with the JDA, nor was their conduct so egregious as to "affect the fundamental fairness of the proceeding," Majority Op. at 7213, the Majority has surprisingly ordered a remand for a determination by the District Court "whether it is clear beyond a reasonable doubt that, at the time the juvenile information was filed, the government's use of Jose's confession to prove up the indictment

on the essential element of knowledge was harmless." Majority Op. at 7215.

The Majority apparently believes that the suppression of an accused's statement, in which he or she admits knowledge of the commission of a crime, also compels the dismissal of an accusatory pleading. This conclusion is squarely contrary to the principle announced in the Supreme Court's decision in *Morrison*, 449 U.S. at 365. In *Morrison*, the Court held that when the Government has improperly obtained incriminating information from an accused "the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." *Id.* Here, the District Court dutifully complied with *Morrison* by excluding Jose's statements. The Supreme Court instructed in *Morrison* that where evidence has been obtained in violation of the Fourth, Fifth, or Sixth Amendments, "[t]he remedy in the criminal proceeding is limited to denying the fruits of the transgression." *Id.* at 366. The Court also stated:

> Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.

*Id.* at 366 n.3 (quoting *United States v. Blue*, 384 U.S. 251, 255 (1966)).

In *United States v. Winsett*, 518 F.2d 51 (9th Cir. 1976), we stated: "As it serves the purpose of deterring police misconduct, the exclusionary rule is a 'needed but grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease.' " *Id.* at 54 n.4 (quoting Anthony G.

Amsterdam*, Search, Seizure and Section 2255: A Comment*, 112 U.Pa.L.Rev. 378, 389 (1964)). The termination of this action by dismissing the information is a lethal remedy that would be summarily rejected by the Supreme Court as a violation of the *Morrison* decision because the District Court suppressed each of Jose's statements.

The Majority has cited *Doe II*, 862 F.2d at 776 for the proposition that "[i]f a violation of the JDA was prejudicial because it led the Government to initiate prosecution of the juvenile, the remedy is for the charges against the juvenile to be dismissed." Majority Op. at 7214, citing *Doe II*, 862 F.2d at 781. In fashioning a remedy that would interfere with the public's interest that the guilty should be prosecuted for their crimes, the three-judge panel that reviewed the *Doe II* case did not cite or discuss the Supreme Court's decision in *Morrison* that expressly bars the dismissal of an accusatory pleading even in the face of *constitutional* error. The *Doe II* case is also factually distinguishable. In *Doe II,* unlike the circumstances in the matter *sub judice,* the juvenile's statements were introduced into evidence. *Doe*, 862 F.2d at 778.

The Majority also cites *United States v. Juvenile (RRA-A)*, 229 F.3d 737 (9th Cir. 2000) as supporting authority for the notion that a federal court may "ensure that the 'prophylactic safeguard for juveniles [is not] eroded or neglected.' " Majority Op. at 7213. The Majority's reliance on *RRA-A* is misleading. We did not hold in *RRA-A* that a district court may dismiss an information as a sanction for a violation of the JDA.

We held in *RRA-A* that because, "RRA-A's confession was the primary basis of evidence on which she was convicted[,] . . . RRA-A's confession should, accordingly, have been suppressed." *RRA-A*, 229 F.3d at 747. We did not hold that dismissal of the information was an appropriate remedy for a violation of the JDA. Instead, we reversed the conviction and remanded the matter to the district court. *Id*. at 748. Contrary

to Majority's characterization of the holding in *RRA-A*, the remand was presumably for a determination by the Government if it could connect *RRA-A* to the alleged criminal offense in a re-trial, without the use of her confession. Thus, unlike *Doe II*, this Court's opinion in *RRA-A* is quite faithful to the Supreme Court's decision in *Morrison*. Because *Doe II* is inconsistent with *Morrison*, we cannot apply it in this matter. "Controlling law in this case, as in all cases governed by federal law, is what Congress has enacted and what the Supreme Court has said regarding the key matters on which the case turns." *Hulteen v. AT&T Corporation*, 441 F.3d 653, 657 (9th Cir. 2006). "Once we understand the terms of controlling law, we can then determine whether there is circuit precedent that is inconsistent. If so, we will have no choice but to ignore such precedent or, to put it more delicately, conclude that such precedent is not binding." *Id.* at 657-658.

In *Doe II*, the majority decision ignored the controlling law set forth in *Morrison*, or simply failed to discover it in its research. In any case, it is not binding on this Court. Dismissal of an information is not an available remedy even where the Government has obtained a statement from an accused in violation of the Constitution. In relying on *Doe II*, the Majority in this matter has apparently chosen to ignore or defy the principle announced in *Morrison*, nor has it even attempted to explain why *Morrison* is inapplicable if a statement is excluded because of *nonconstitutional* errors committed by officers in violation of the JDA.

**B**

The Majority has also erred in instructing the District Court to apply the reasonable doubt standard in determining whether the statutory violations of the JDA were harmless. Majority Op. at 7215. The Majority cites *Doe II* for this standard.

The Majority in *Doe II* stated that if a violation of the JDA did not amount to a due process violation, the question was

whether the "violation [was] harmless to the juvenile beyond a reasonable doubt." *Doe II*, 862 F.2d at 779. The harmless beyond-a-reasonable-doubt test applies only to violations of the Constitution. *See United States v. Lane*, 474 U.S. 438, 446 n.9 (1986); *see also Chapman v. California*, 386 U.S. 18, 24 (1967) (devising beyond-a-reasonable-doubt standard for harmless error for constitutional violations). "Traditionally, the courts have viewed as constitutional errors those errors violating specific provisions of the Bill of Rights." *United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977) (internal quotations and citation omitted). For nonconstitutional error, we apply a less stringent standard. *Id.*; *see also Lane*, 474 U.S. at 446 n.9 (stating that the test for "constitutional errors is considerably more onerous than the standard for non-constitutional errors."). In the case of nonconstitutional error, we ask whether the error was more probably than not harmless. *Valle-Valdez*, 554 F.2d at 916; *Kotteakos v. United States*, 328 U.S. 750, 758-59 (1946) (asking whether nonconstitutional error may have had a substantial influence on the outcome of the proceeding).

The authority cited by this Court in *Doe II* supports this distinction. It does not support the premise for which it was cited in *Doe II*. In *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), the Supreme Court held that "[i]t would be inappropriate to devise a rule permitting federal courts to deal more sternly with nonconstitutional harmless errors than with constitutional errors that are likewise harmless." *Id.* at 256. In *Bank of Nova Scotia*, the Court applied a test for nonconstitutional error it had previously articulated in *Kotteakos*, 328 U.S. at 758-59. *Id.*

Similarly, in *United States v. Indian Boy X*, 565 F.2d 585 (9th Cir. 1977), we concluded that the appropriate standard for a violation of the JDA was whether the "error was more probably than not harmless." *Id.* at 592. Therefore, although in *Doe II* the Court misstated the appropriate standard to be applied by an appellate court in reviewing nonconstitutional

error, it cited cases that applied the appropriate standard. Furthermore, the majority in *Doe II* did not instruct the district court to determine whether the error was harmless beyond a reasonable doubt. Instead, the majority in *Doe II* held that an *appellate court's* duty in reviewing nonconstitutional error is to determine "was the violation harmless to the juvenile beyond a reasonable doubt?" *Doe II*, 862 F.2d at 779. Contrary to the Majority's instruction to the district court in this matter, *Doe II* does not provide that a district court must determine whether there was nonconstitutional error beyond a reasonable doubt.

In *Doe II*, this Court stated that dismissal was appropriate because it had the "*discretion* to reverse or *to order more limited remedies* so as to ensure that *Doe*'s rights are safeguarded." *Doe II*, 862 F.2d at 780 (emphasis added). We have the discretion to determine the appropriate remedy, consistent with binding legal authority, for violations of the JDA. It would be an abuse of discretion as a matter of law to dismiss an information in violation of the Supreme Court's instruction in *Morrison* that dismissal of an accusatory pleading is not a proper remedy where evidence was excluded at trial.

## IV

The Majority's remand order will undoubtedly leave the District Court totally baffled in another respect. The District Court excluded all of Jose's statements because Agent Cabrera failed to notify Jose's aunt or his parents of his constitutional rights. It found Jose guilty beyond a reasonable doubt, however, based on his false statements to the primary inspection officer about his reason for entering the United States, his demeanor, and the huge quantity of cocaine he was smuggling into the United States. That evidence was obtained *before* Jose was arrested. Jose has not challenged the sufficiency of the evidence produced at his trial to establish his guilt beyond a reasonable doubt.

The Majority states that "[t]he record is silent as to what other evidence the government could have produced at the time the juvenile information was filed to prove up the essential element of knowledge." Majority Op. at 7215. This statement ignores the evidence produced at trial and the law of this circuit that knowledge can be inferred from the mere possession of a large amount of drugs. *See United States v. Cervantes*, 219 F.3d 882, 893 (9th Cir. 2000) (inferring knowledge from the possession of 30 pounds of methamphetamine); *see also Gaylor v. United States*, 426 F.2d 233, 235 (9th Cir. 1970) (holding that testimony as to the value of cocaine was relevant to the issue of knowledge since it tended to refute "the possibility that a stranger could have placed such a valuable cargo in a vehicle in the hope that the vehicle could be followed and the cocaine later recovered in the United States.").

Here, 63.3 pounds of cocaine, with a street value of more than two million dollars, were found hidden in the vehicle driven by Jose. This evidence was clearly sufficient under the law of this Circuit to demonstrate that he had knowledge that he was smuggling cocaine without reliance on his statements to the officers.

I would affirm the District Court's judgment in all respects. I would not require the District Court to determine whether the information should be dismissed because Agent Cabrera failed to notify his parents, before he was interrogated by other officers. The dismissal of the information would surely be summarily reversed in a subsequent appeal by the Government since it would be in violation of the rule announced by our nation's highest court in *Morrison*.