# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

v.

C. M. (A JUVENILE),
      *Defendant-Appellant.*

No. 05-50585

D.C. No.
CR-05-00873-DMS

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued February 14, 2006
Submitted May 2, 2007
Pasadena, California

Filed May 8, 2007

Before: Betty B. Fletcher, Warren J. Ferguson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Ferguson;
Dissent by Judge Callahan

**COUNSEL**

Michelle Villasenor-Grant, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

Christopher M. Alexander, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

**OPINION**

FERGUSON, Circuit Judge:

Title 18 U.S.C. § 5033 of the Juvenile Delinquency Act ("JDA") prescribes the process due to a juvenile who is placed in federal custody. The arresting officer must immediately advise the juvenile of his or her rights; immediately advise the juvenile's parents, guardian, or custodian of the juvenile's rights; comply with any request by the juvenile to speak with his or her parents or a parental surrogate; and

bring the juvenile before a magistrate "forthwith." None of these requirements were met in this case — C. M. was not advised of his rights until six hours after his arrest; neither his parents, nor any individual who could act *in loco parentis*, were notified of C. M.'s rights; C. M.'s repeated requests to speak with a representative of his consulate went unheeded; and C. M. was locked in a holding cell for nearly ten hours before being brought before a magistrate.

We find that the government violated every requirement of 18 U.S.C. § 5033, and that these violations were not harmless. As a result of the government's illegal conduct, C. M. lost his right under § 5033 to the advice of an adult guardian prior to interrogation. C. M.'s confession, which should have been suppressed, was used to support the information initiating his prosecution. Because the government's misconduct constitutes prejudicial error, we reverse.

## I.   BACKGROUND

### A.   Arrest and Detention

Around 4:25 a.m. on May 20, 2005, seventeen-year old C. M., a Mexican national, approached the border patrol checkpoint on the I-8 westbound near Pine Valley, CA. He stopped his vehicle and the officer on duty observed two persons seated in the back with their heads down. C. M. responded briefly to the officer's questions and then proceeded forward without having been visibly flagged on. The officer yelled for deployment of a "spike mat," which flattened the tires on the vehicle and brought it to a rest about a half-mile from the checkpoint. C. M. and the six other occupants of the vehicle were apprehended as they scattered into the nearby brush. The arresting agents, Saul Enriquez and Rebecca Brudnok, transported C. M. and the six other occupants of the vehicle to the checkpoint for processing. A keyless entry remote for the vehicle was found on C. M.

At the checkpoint, arresting agents Enriquez and Brudnok locked C. M. in a holding cell and began processing the detainees, including asking each of them basic biographical questions. From the birthdate that C. M. gave the arresting agents, they realized he was a minor. Neither arresting agent, nor any other agent at the checkpoint, informed C. M. of his rights or attempted to contact his parents.

After two hours had elapsed, Agent Enriquez informed C. M. that he had the right to speak with the Mexican consulate. C. M. asked to exercise this right. Agent Enriquez called the consulate, but upon receiving no answer, hung up the phone without leaving a message. Agent Enriquez did not make any further attempts to contact the consulate. Instead, he called a supervisor, who told Agent Enriquez that they would try to contact the consulate "later." Agent Enriquez testified that, "at the time," he did not have an all-hour emergency number for the consulate and did not know "for sure" that such a number existed. Agent Brudnok, however, testified that an all-hour number for the Mexican consulate was kept at the border checkpoint. Agent Brudnok also testified that she never attempted to contact the consulate with that all-hour number.

Four hours later, at 10:15 a.m., Supervisory Border Patrol Agent David Holt contacted consular official Ivan Castillo and advised Castillo that C. M. was a juvenile being held for alien smuggling. C. M. was not concurrently given the opportunity to speak with the consulate.

At 10:20 a.m., Border Patrol Agent Luis Gutierrez arrived at the checkpoint from San Diego to assist with processing C. M. Forty minutes later, around 11 a.m., Agent Gutierrez first notified C. M. of his *Miranda* rights in Spanish. C. M. waived his right to remain silent and Agent Gutierrez proceeded to question him. Sometime after beginning the interrogation, Agent Gutierrez asked C. M. whether he had contact information for his parents. C. M. responded that he did not.

Around 12:40 p.m., Agent Gutierrez re-advised C. M. of his *Miranda* rights. The record does not indicate whether C. M. waived his rights this time. Nonetheless, Agent Gutierrez continued questioning C. M., who again asked to speak with the Mexican consulate. Agent Gutierrez ignored C. M.'s request, telling C. M. that he would get a chance to speak with the consulate and an attorney later. During the second period of questioning, C. M. indicated that he was living with his uncles in Los Angeles. Presentence Report ("PSR") 2. Agent Gutierrez did not attempt to contact C. M.'s uncles, but instead continued to question C. M., who ultimately gave a sworn statement incriminating himself.

The government used C. M.'s incriminating statements to support a juvenile information that it filed against C. M. that afternoon, alleging six counts of delinquency. After obtaining C. M.'s incriminating statement, the government transported the juvenile to San Diego, where he was arraigned around 4 p.m. on the information. The information charged C. M. with three counts of transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and three counts of bringing in illegal aliens for "commercial advantage or private financial gain," in violation of 8 U.S.C. § 1324(a)(2)(B)(ii). At the arraignment, the magistrate judge appointed C. M. counsel and noted that no family members or representatives of the Mexican consulate were present. C. M., through counsel, denied the allegations in the information. Dist. Ct. Rec. 4.

## B.   Motions and Trial

On June 1, 2005, C. M. filed motions to suppress statements, to suppress evidence, and to dismiss the information due to multiple violations of 18 U.S.C. § 5033. The government filed its response on June 13, 2005, also filing motions in limine to exclude expert testimony, admit evidence of transport, admit evidence of prior misconduct, admit demeanor evidence, and admit statements concerning financial arrangements.

The motion hearing and trial were conducted together on June 15, 2005. The District Court granted the government's motions in limine, except the motion to admit Rule 404(b) evidence of prior misconduct. The District Court concluded there were violations of the JDA, but that these violations did not deny C. M. due process. As such, the Court denied C. M.'s motion to dismiss the information. The District Court also discussed prejudice, but declined to make a specific finding as to whether the violations of the JDA prejudiced C. M., indicating that the remedy for such prejudice would be "suppression of the statement," which, in the District Court's view, had already occurred because the government stipulated it would not use C. M.'s post-arrest statements in its case-in-chief.

During trial, the government called three occupants of the vehicle as material witnesses. The witnesses testified to substantially similar stories of how they crossed the border into the United States and waited for transport along the side of a highway. The witnesses also testified to their understanding that they would have to pay for their transport — either to a friend, or a friend of a friend. The witnesses generally did not know how much they would owe, when payment was due, or how they were expected to pay. None saw the driver of the vehicle or knew C. M.

At the close of the government's case, C. M. made a Fed. R. Crim. P. 29 motion on all counts, which the District Court denied. The District Court found C. M. delinquent on the six counts and sentenced him to twenty-one months in custody and three years of supervised release. C. M. timely appeals to this Court, contending that his juvenile information should be dismissed due to multiple, egregious violations of the JDA, which prejudiced his statutory rights and amounted to a denial of due process. C. M. also claims there was insufficient evidence presented at trial to find him delinquent.

## II. STANDARD OF REVIEW

Compliance with the JDA is a question of statutory interpretation reviewed de novo. *United States v. Jose D.L.*, 453 F.3d 1115, 1120 (9th Cir. 2006). We review de novo whether the juvenile and his or her parents or guardian were notified "immediately" of the juvenile's rights, since such questions "turn on the legal interpretation of 'immediate.' " *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000) (*Doe IV*). Whether the parents or guardian of a juvenile have been properly notified pursuant to 18 U.S.C. § 5033 is a predominately factual question that we review for clear error. *United States v. Juvenile (RRA-A)*, 229 F.3d 737, 742 (9th Cir. 2000). Whether a juvenile has been arraigned "forthwith" is a mixed question of law and fact reviewed de novo. *Doe IV*, 219 F.3d at 1014.

## III. DISCUSSION

This Court has repeatedly held that a juvenile is entitled to relief under § 5033 when the government violates the requirements of the statute and causes the juvenile constitutional or statutory harm. Where the government's violations deprive the juvenile of his or her constitutional rights, reversal is required. *See RRA-A*, 229 F.3d at 744. If the violations result in statutory prejudice, and irrespective of whether they amount to a constitutional deprivation, this Court has the "discretion to reverse the conviction so as to ensure that the prophylactic safeguard for juveniles not be eroded or neglected." *Id.* (internal quotation marks and citation omitted). Accordingly, we first determine whether the JDA has been violated. If it has, we then consider the harm, if any, caused by the violations.

### A. The Government Violated the JDA

**[1]** The JDA provides in relevant part:

> Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.

> The juvenile shall be taken before a magistrate judge forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge.

18 U.S.C. § 5033. The burden is on the government to show compliance with § 5033. *Jose D.L.*, 453 F.3d at 1120. Here, C. M.'s arresting officers violated every requirement mandated by Congress in § 5033: they failed timely to notify C. M. of his rights; failed to engage in reasonable efforts to contact C. M.'s parents or guardian; failed to provide adequate consular notification in the event C. M.'s parents could not be reached; failed to honor C. M.'s request to speak with a consular representative; and failed to arraign C. M. forthwith.

### 1. *Advising C. M. of his rights*

**[2]** C. M. was placed in custody shortly before 5 a.m. on May 20, 2005, when he was apprehended in the field and locked in a holding cell at the I-8 checkpoint. *See Doe IV*, 219 F.3d at 1014 (a juvenile is taken into custody when he would have reasonably believed "he was not free to leave") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). C. M. was therefore in custody for six hours before being advised of his rights at 10:55 a.m., which violates § 5033's requirement that juveniles in federal custody be immediately

advised of their rights. *See Doe IV*, 219 F.3d at 1014 (finding three and a half hours to be a statutory violation because "[a]lthough there is a dearth of case law interpreting 'immediately' in the context of 18 U.S.C. § 5033, a three and a half hour delay simply does not comport with the plain meaning of the word"); *RRA-A*, 229 F.3d at 744 (holding that a four hour delay in advising a juvenile of her rights does not qualify as "immediately" under § 5033).

### 2.   *Parental notification*

The District Court did not determine whether the government violated § 5033's parental notification provisions. We have held that these provisions require that "[r]easonable efforts . . . be made to notify the parents," *United States v. Doe*, 701 F.2d 819, 822 (9th Cir. 1983) (*Doe I*), that the notification "have substantive content,"[1] *United States v. Doe*, 862 F.2d 776, 779 (9th Cir. 1988) (*Doe II*), and that the phrase "immediately notify" mean the same thing as it does in the context of "immediately" advising the juvenile of his or her rights, *see Doe IV*, 219 F.3d at 1014-15. In the event the juvenile's parents live outside the United States and cannot be reached, the arresting officer should provide notification to the juvenile's consulate. *See RRA-A*, 229 F.3d at 744-45.

**[3]** Here, the arresting officers did not even attempt to

---

[1]This Circuit — guided by the text and evident purpose of § 5033 "to provide meaningful protection to juveniles by facilitating parental involvement," *see United States v. Wendy G.*, 255 F.3d 761, 766-67 (9th Cir. 2001) — has required the following substantive content to parental notification: the arresting officer must advise the parents of their child's *Miranda* rights contemporaneously with advising them of their child's custody, *United States v. Doe*, 170 F.3d 1162, 1167 (9th Cir. 1999) (*Doe III*), and the officer must also advise the parents that they are permitted to speak with their child before the child is interrogated, *Wendy G.*, 255 F.3d at 767. Moreover, an arresting officer may not unreasonably refuse a request by either the juvenile or the parent to communicate with one another before the juvenile is interrogated. *Doe IV*, 219 F.3d at 1017.

reach C. M.'s parents until Agent Gutierrez, sometime after 11 a.m., asked C. M. for his parents' contact information, *after he had already begun questioning C. M.* Agent Enriquez, who had arrested C. M. over six hours earlier, testified that although he was aware of the JDA's parental notification requirements, he made no attempt to contact C. M.'s parents or to ask C. M. how to reach his parents. Waiting until C. M. had been in custody for more than six hours before attempting to notify his parents does not constitute reasonable efforts to notify the juvenile's parents "immediately," and therefore violates the JDA. *See Doe IV*, 219 F.3d at 1014-15 (noting that the start of custody, not the start of interrogation, is the trigger for parental notification; thus, the officers violated § 5033's immediacy requirement by waiting until the juvenile had been in custody for three and a half hours before attempting to contact his parents). Nor were C. M.'s arresting officers permitted to focus solely on consular notification, and bypass contacting his parents, as a way of satisfying § 5033. *See Doe II*, 862 F.2d at 779 (even when the parents live outside the United States, the officers cannot simply notify the consulate, but must also make reasonable efforts to contact the parents).

**[4]** Additionally, by its own terms, § 5033's parental notification provision applies with equal force to guardians and custodians of the juvenile. *See* 18 U.S.C. § 5033 (requiring immediate notification to "the juvenile's parents, guardian, or custodian" of the juvenile's custody, rights, and alleged offense). Thus, if parental notification is not possible, the government is not relieved of its substantive obligation to make the advice and counsel of a responsible adult available to the juvenile prior to interrogation. Instead, if a guardian or custodian is available, the JDA clearly requires that the arresting officer provide notification to the guardian or custodian just as he or she would provide notification to the parents.

**[5]** Here, while C. M. did not have his parents' contact information, he told his interrogators that he was living with

his uncles in Los Angeles. PSR 2. As soon as Agent Gutierrez discovered this fact, he had a duty to halt the interrogation and make reasonable efforts to provide immediate notification to C. M.'s uncles, as parental surrogates. This would include asking C. M. for his uncles' contact information, which the record demonstrates C. M. could have provided, had he been notified of his right to speak with a responsible adult prior to interrogation. Agent Gutierrez's failure to make timely contact with C. M.'s uncles in this case violates the JDA's clear requirement that the arresting officer provide immediate notification to an adult responsible for the juvenile — usually to the juvenile's parents, but possibly to a guardian or custodian instead.

### 3. Consular notification

In the event parental notification is not possible and the juvenile's parents live abroad, adequate consular notification consists of "reasonable efforts to notify the consulate of the juvenile's custody and rights prior to interrogation." *RRA-A*, 229 F.3d at 745. As we explained in *RRA-A*, the primary functions of consular notification are to "facilitate contact with the parents . . . by providing an in-country mechanism for locating [them]," *id.* at 745-46, and "to permit diplomatic officials to become involved as surrogates for parents who are not in the country," *id.* at 746. Consular notification "must thus occur as soon as reasonably possible after the arresting officer has difficulty contacting the [ ] parents so that the minor has access to meaningful support and counsel," as contemplated by § 5033. *Id.*

**[6]** The supervisor of C. M.'s arresting officers, Agent Holt, notified the Mexican consulate of C. M.'s custody and alleged offense around 10:15 a.m., over five hours after C. M.'s arrest and almost four hours after C. M. had explicitly asked to speak with a representative of his consulate. This notification was patently inadequate. First, the notification was not timely. C. M.'s arresting officers failed to use reason-

able efforts to notify the consulate as soon as possible, *see id.*, by using the 24-hour hotline that Agent Brudnok testified was kept at the border checkpoint; *see* Dist. Ct. Rec. 16. Second, the notification was substantively inadequate. When Agent Holt finally contacted the consulate, he did not notify the consulate of any of C. M.'s legal rights, as we have held is required under the JDA. *See id.* at 745.

### 4. *Right to speak with the consulate*

The District Court found, and we agree, that the arresting officers did not comply with C. M.'s request to speak with the Mexican consulate prior to being Mirandized. This finding is not clearly erroneous; rather, it fairly reflects the record. The only evidence the government provides that C. M. spoke with the consulate is C. M.'s statement to Agent Gutierrez during questioning to the effect that "he had spoken with the consulate before." But C. M. said this immediately after asking Agent Gutierrez when in fact he would be able to speak with the Mexican consulate that day. Read in context, it is abundantly clear that C. M. meant by his statement *not* that he had already had the opportunity to speak with the consulate *on May 20*, but that he had on a previous occasion been able to speak with the consulate. Moreover, the government fails to show when C. M. would have had the opportunity to speak with the consulate while in custody on May 20. Instead, Agents Brudnok, Enriquez, and Gutierrez all testified that they did not put C. M. in touch with the consulate. Indeed, the record shows that the only person to speak with the consulate on May 20 was the supervisor of the arresting agents, who did not concurrently afford C. M. his right to speak with a country representative.[2]

**[7]** The record reflects that the agents repeatedly ignored

---

[2]Indeed, it is unclear whether Agent Holt was even present at the checkpoint where C. M. was being held when he made contact with consular official Castillo.

C. M.'s request to speak with the Mexican consulate. Such disregard constitutes a violation of § 5033. In *Doe IV*, we held that an arresting officer may not unreasonably refuse a request by either the juvenile or his or her parent to communicate with one another before the juvenile is questioned. 219 F.3d at 1017. We have repeatedly held that consular notification operates as a proxy for parental notification, *see, e.g., RRA-A*, 229 F.3d at 745-46, and must therefore be substantive.[3] For example, consular notification must include notice of the juvenile's rights in addition to the fact that the juvenile is in custody. *Id.* at 745. Like parental notification, the purpose of consular notification is not to "impart[ ] general information in the abstract," *Doe IV*, 219 F.3d at 1017, but to satisfy § 5033's substantive requirement of meaningful protection for the juvenile by enabling diplomatic officials "to become involved as surrogates for parents who are not in the country," *RRA-A*, 229 F.3d at 746. In *Doe IV*, we reiterated that Congress intended for parents to be informed of their child's rights so that they could assist their child in a meaningful way; the notification to the parents is reduced to an empty recitation of facts if a child's request to speak with his or her parent is simply ignored. *See* 219 F.3d at 1017. So too is consular notification rendered an empty formality, and the evident purpose of § 5033 thwarted, if the juvenile's request to speak with the consulate in his or her parents' stead is simply ignored. We therefore hold that a juvenile's request to speak with his or her consulate cannot be unreasonably denied and we protect a juvenile's right to confer with a parental surrogate while in custody, in the event his or her parents cannot be reached. C. M.'s arresting officers violated § 5033 in ignoring C. M.'s repeated requests to confer with a country representative.

---

[3]See *supra* note 1 for the substantive requirements for parental notification.

*5. Prompt arraignment*

**[8]** Section 5033 provides that a juvenile in federal custody "shall be taken before a magistrate judge forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge." 18 U.S.C. § 5033. " 'Forthwith' means 'with dispatch' or 'immediately.' " *United States v. L.M.K.*, 149 F.3d 1033, 1035 (9th Cir. 1998), *as amended* 166 F.3d 1051. The plain meaning of § 5033 is thus that juveniles must be arraigned with dispatch or immediately, unless factors are present to excuse a reasonable delay. We have found only a limited set of factors that rise to the level of exigency necessary to justify a delay: for example, that no magistrate judge is immediately available, *Doe I*, 701 F.2d at 824; that the officers are extremely busy and must prioritize more urgent cases, *id.* (describing such cases to be "a woman in late pregnancy and women with infants and small children"); and that the officers are trying to reach the parents or consulate, *see RRA-A*, 229 F.3d at 746.

**[9]** Here, there was a delay of eleven hours in bringing C. M. before a magistrate. The government does not cite any extenuating circumstances to justify this delay, but rather points to the routine tasks of processing, interrogating, and transporting the juvenile. Red Br. at 22. In comparing the amount of time it took to perform these routine tasks with the total amount of time that elapsed before C. M. was arraigned, we find that the government has not met its burden of showing that it acted with the expediency required by § 5033 in bringing C. M. before a magistrate.

**[10]** The record indicates that C. M. was processed between 5 and 6:30 a.m., interrogated between 11 a.m. and about 1 p.m., and then transported a distance of forty-five miles, which requires about an hour's travel. The four to five hours that it took to conduct these tasks do not explain why eleven hours elapsed before C. M. was arraigned. Given the dispatch

with which juveniles must be arraigned under § 5033, it was not reasonable to delay five to six hours to interrogate C. M., or to process any of the other adult occupants of the vehicle ahead of him. *See Doe I*, 701 F.2d at 824 (requiring the government to prioritize the arraignment of juveniles); *Doe IV*, 219 F.3d at 1015 (calling for the expedited handling of juveniles as compared to adults). There is even less reason for the government's delay here given that it cannot be excused on the basis that the officers were trying to put C. M. in touch with his parents or the consulate. Indeed, we are troubled by the government's contrary claim that the reason for the delay in arraigning C. M. was the officers' need to comply with § 5033's parental notification provisions, when, as detailed in the preceding sections, the officers did not make reasonable efforts to notify the parents or consulate to begin with.[4] We conclude that the government has failed to meet its burden of showing that it complied with the JDA's prompt arraignment requirement.

## B.   The Violations of the JDA Were Not Harmless

**[11]** Having determined that the government violated § 5033 in every respect, we turn to the question of remedies. Reversal of C. M.'s conviction is mandatory if the government's misconduct deprived C. M. of any constitutional right. *See RRA-A*, 229 F.3d at 744. Furthermore, irrespective of whether the government's misconduct rose to the level of a constitutional violation, if it gave rise to prejudice under the JDA, we may "reverse or [ ] order more limited remedies so as to ensure that [C. M.'s statutory] rights are safeguarded and the will of Congress is not thwarted." *Id.* at 747. For example,

---

[4]Specifically, the government asserted during oral argument that the arresting agents had to delay six hours to notify C. M. of his rights because "they couldn't get in contact with the consulate and they didn't know any contact information for the parents." This claim ignores the fact that the first time any officer asked C. M. for his parents' contact information was sometime *after* the juvenile was Mirandized around 11 a.m. and the interrogation had already begun.

where violations of the JDA contribute to a juvenile's confession and that confession results in the juvenile's prosecution, the juvenile is prejudiced by the government's misconduct and the charges against him or her must be dismissed. *Doe II*, 862 F.2d at 781. In assessing harmlessness, we must be convinced beyond a reasonable doubt that the government's misconduct did not give rise to any prejudice. *See Wendy G.*, 255 F.3d at 767.

Our first inquiry is whether the violations of the JDA were a cause of C. M.'s confession. In other words, did C. M.'s confession result in part from "[his] isolation from family, friends, [or] representatives of [his] country or an attorney"? *RRA-A,* 229 F.3d at 747. Here, prior to being interrogated, C. M. was locked in a holding cell for six hours without any notification of his rights. During this time, his request to speak with a country representative went unheeded. Seven hours later, after his interrogation had begun, C. M. repeated his request to contact his consulate, which Agent Gutierrez flatly refused. Only after Agent Gutierrez unlawfully denied C. M.'s request to speak with his consulate did C. M. finally confess. Moreover, when C. M. was finally afforded contact with a responsible adult during his arraignment, he promptly denied the statements contained in the information, including the incriminating statements he had made only a few hours before. We have little difficulty under these circumstances in concluding that the government's multiple violations of the JDA were, "at the very least, *a* cause of [C. M.'s] confession." *Id.* The many hours C. M. spent locked in the holding cell without being advised of his rights; the repeated and unlawful denial of C. M.'s right to speak with a parental surrogate before being interrogated; and the undue delay in arraigning C. M. all improperly "interfere[d] with [C. M.'s] right to remain silent." *Doe IV*, 219 F.3d at 1018. There is therefore a statutory basis to suppress the confession.

[12] The only remaining question is the prejudice caused by C. M.'s confession. Here, the government relied on C.

M.'s statements, obtained in deprivation of his statutory rights, to procure the juvenile information and initiate proceedings against C. M. The record is clear that the delay in arraigning and charging C. M. was incurred in order to permit a senior officer, Agent Gutierrez, to travel to the checkpoint and interrogate C. M. When the information was filed, C. M.'s incriminating statements were the only evidence the government presented of C. M.'s awareness that the occupants of the vehicle were illegal immigrants, and C. M.'s intent to facilitate transport for financial gain — both essential elements of the crimes with which C. M. was charged. *See* 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(2)(B)(ii). We conclude that the government's reliance on the fruits of its misconduct to initiate proceedings against C. M. was not harmless beyond a reasonable doubt. The appropriate remedy in this case is to dismiss the charges. *See Doe II*, 862 F.2d at 781; *Jose D.L.*, 453 F.3d at 1126 ("If a violation of the JDA was prejudicial because it led the Government to initiate prosecution of the juvenile, the remedy is for the charges against the juvenile to be dismissed.").

Our conclusion that dismissal is warranted derives not only from this Court's holdings in *Doe II* and *Jose D.L.*, but also from our obligations under the JDA. In remedying violations of § 5033, this Court is charged with ensuring "that the prophylactic safeguard for juveniles not be eroded or neglected." *RRA-A*, 229 F.3d at 744 (internal quotation marks and citation omitted). Here, the government violated every requirement of § 5033. Further, the agents involved uniformly testified to their familiarity with their obligations under the JDA. Yet, despite their familiarity with the statute, the agents failed to engage in the basic steps necessary to comply with the JDA. Agents Enriquez and Brudnok both testified that they knew they had to notify C. M. immediately of his rights, yet, inexplicably, neither ever did so. Both agents also testified to their understanding that they had to notify the juvenile's parents as soon as possible — but again, neither did so. Both agents, as well as Agent Gutierrez, testified that they knew C. M. had a

right to speak with the consulate, yet, during the eleven hours that elapsed before C. M. was arraigned, no one put C. M. in touch with the consulate — not even when Agent Holt had the consulate on the phone at 10:15 a.m.

The harm that flows from such conduct extends beyond the prejudicial impact on the individual of any improperly elicited statements. The harm also erodes the comprehensive system of juvenile justice that Congress has established through the federal juvenile laws.[5] As we noted in *United States v. Frasquillo-Zomosa*, the JDA "creates a special procedural and substantive enclave for juveniles accused of criminal acts," which stands apart from "the ordinary criminal justice system" and accords juveniles "preferential and protective handling not available to adults accused of committing crimes." 626 F.2d 99, 101 (9th Cir. 1980). It is this system of juvenile justice, as well as C. M.'s individual rights, that we are charged with protecting. Here, the government's conduct effectively nullified the unequivocal provisions of the statute defining the process that Congress has mandated juveniles in federal custody are due. We caution against further erosion of the critical protections due to juveniles under the JDA. *See Jose D.L.*, 453 F.3d at 1125 (finding that the government "flagrantly violated" the JDA); *Wendy G.*, 255 F.3d at 768 (reversing due to multiple, prejudicial violations of the JDA); *RRA-A*, 229 F.3d at 747 (same); *Doe IV*, 219 F.3d at 1014-15 (same); *Doe III*, 170 F.3d 1162 (finding the government vio-

---

[5]In enacting the JDA, Congress intended "to improve the quality of juvenile justice and to *provide a comprehensive, coordinated approach to the problems of juvenile delinquency*." S. Rep. No. 93-1011, at 1 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5283, 5283 (emphasis added). The Senate Report on the JDA further notes that the "United States has a long tradition of dealing differently with juveniles than with adults," but "many of the methods of dealing with juveniles in this country have come to be viewed either as counterproductive or as violations of the rights of children" — "[t]hus there is a pressing need for national standards to improve the quality of juvenile contacts with the justice system." S. Rep. No. 93-1011, at 25-26 (citation omitted).

lated the JDA); *L.M.K.*, 149 F.3d at 1035 (same); *Doe II*, 862 F.2d at 780-81 (remanding due to multiple violations of the JDA); *Doe I*, 701 F.2d at 821 (finding multiple violations of the JDA). As we recently observed,

> [O]ver thirty years after the JDA was enacted, government law enforcement agents trample even the most basic requirements of the JDA. . . . We do not believe that it furthers Congress's intent to allow the government, in case after case, to ignore with impunity the protective requirements of the JDA. Courts should not close their eyes to these continuing violations by mindlessly reciting the rubric of harmless error as an overarching excuse for ignoring what Congress has clearly ordained . . . .

*Jose D.L.*, 453 F.3d at 1125 (citations omitted).

## IV.   CONCLUSION

C. M. was deprived of his rights under § 5033 to immediate notification and prompt arraignment, and to the advice and counsel of a responsible adult prior to interrogation. His resulting confession was highly prejudicial and should not have been used against him to initiate his proceedings. Accordingly, we **REVERSE** the District Court's adjudication of delinquency, **DISMISS** the juvenile information, and **REMAND** for further proceedings not inconsistent with this opinion.[6]

---

CALLAHAN, Circuit Judge, dissenting:

I question whether the government agents violated 18

---

[6]Having reversed based on our finding of statutory prejudice, we need not reach the alternative grounds for relief advanced by Appellant.

U.S.C. § 5033 of the Juvenile Delinquency Act ("JDA") in their processing of C.M. in as many ways as the majority states, but I agree with the majority's implicit determination that the alleged violations did not rise to the level of a constitutional violation. *See United States v. D.L.*, 453 F.3d 1115, 1125 (9th Cir. 2006). I disagree, however, with the majority's determination that the alleged violations, were prejudicial and with its directions that the juvenile information must be dismissed. I read our precedent as requiring not only a determination of whether the violations contributed to the juvenile's statements, but also whether the improperly procured statements were harmless. Here, the improperly procured statements were harmless, but even if this conclusion were in doubt, our precedents direct that the proper remedy is a remand. *D.L.*, 453 F.3d at 1126-27; *United States v. RRA-A*, 229 F.3d 737, 747 (9th Cir. 2000); *United States v. Doe* (*Doe II*), 862 F.2d 776,781 (9th Cir. 1988).

I

Accepting that the record supports a determination that the Government's violations of the JDA were a cause of C.M.'s statements, the remaining issue is whether the procurement of the confession, which was not admitted or referred to at C.M.'s trial, was harmless or prejudicial. The majority concludes that it was prejudicial because C.M.'s statements that he was aware that the occupants of the vehicle were illegal immigrants and that he was driving the vehicle in order to reduce the fee he would have to pay for being smuggled into the United States were set forth in the declaration of the agent supporting the juvenile information. The majority, however, fails to give any weight to the other evidence that supported the initiation of proceedings.

This evidence included that C.M. drove up to a border patrol check point at 4:25 a.m. Although C.M. initially stopped at the check point, he then rapidly accelerated away from the check point, without authority to leave. The agent

activated a controlled tire deflation device, and the vehicle, with two flattened tires, came to a stop one-half mile from the check point. The driver of the vehicle was identified as wearing something orange and when C.M. was discovered hiding in some nearby brush after abandoning the vehicle, he was wearing a shirt with orange sleeves. C.M. had on his person the keyless remote entry for the abandoned vehicle. In addition, three passengers that the border agent had spotted crouched in the back of the vehicle were also discovered hiding nearby and they testified that they were attempting to enter the United States illegally. When C.M.'s fingerprints were taken, he was identified as having failed to yield at a border check point four months earlier. Thus, the Government had sufficient evidence on which to initiate juvenile proceedings without the mention of C.M.'s confession.

The majority cites *Doe II* as supporting its conclusion that "the government's reliance on the fruits of its misconduct to initiate proceedings against C.M. was not harmless beyond a reasonable doubt," but the facts in *Doe II* were very different. There, although the Government did not use Doe's statements in its case-in-chief, the statements were introduced through defense cross-examination of a Government agent. 862 F.2d at 778. This use of the statements is the predicate on which the court determined that the statutory violations "must be said to have prejudiced Doe."[1] *Id*. at 781. Indeed, the fact that the statements were used at trial was critical to the disposition of the case as the panel split three ways on the appropriate remedy. Judge Tang thought the violations were so egregious that the panel should direct the dismissal of the charges. *Id*.

---

[1]The opinion states: "[i]f the prosecution resulted from the confession and the confession came in part as a result of Doe's isolation from family, friends, representatives of his country or an attorney, then the statutory violations must be said to have prejudiced Doe." 862 F.2d at 781. Although not clear of ambiguity, I do not read this sentence as holding that the procurement of a statement from a juvenile in violation of the JDA necessarily means that a subsequent conviction must be vacated where, as here, the statement is not admitted or referred to at the trial.

at 782. Judge Farris, the author of the opinion, remanded the matter to the district court to determine whether the violations of the JDA "prejudiced Doe's defense." *Id.* at 781. Judge Wallace was of the opinion that the record demonstrated that Doe suffered no prejudice.[2] *Id.* at 782. As the use of the juvenile's statement at trial in *Doe II* did not mandate the dismissal of the juvenile information, it follows that in this case the use of the statement in a preliminary statement by an agent, but not at trial, should not mandate the dismissal of the juvenile information.[3]

The majority attempts to bolster its determination of prejudice by arguing that the Government's failure to follow the JDA erodes "the comprehensive system of juvenile justice that Congress has established through the federal juvenile

---

[2]Judge Wallace's reasoning is particularly relevant to this case. He explained that the court was faced

> with the effect of a nonconstitutional statutory violation on the decision to charge and prosecute. We must therefore consider whether Doe's post-arrest statements substantially influenced the decision to charge and prosecute Doe, or whether we have grave doubts that this decision was free from the substantial influence of Doe's statements. Neither of these tests is met in this case. The government expressly stipulated that it would not use these statements at trial. It would not have pursued Doe's prosecution without believing that there was a good chance of obtaining a conviction without that evidence. Doe's post-arrest statements, therefore, could not have substantially influenced the decision to charge and prosecute. For the same reasons, I have no grave doubts that the decision to charge and prosecute Doe was free from the substantial influence of the government's statutory violations.

862 F.2d at 783.

[3]The other cases relied upon by the majority similarly concern the use at trial of statements procured in violation of the JDA. In *United States v. Doe* (*Doe IV*), 219 F.3d 1009, 1013 (9th Cir. 2000), the juvenile's statements were used at trial. In *RRA-A*, the court determined that "RRA's confession was the primary basis of evidence on which she was convicted." 229 F.3d at 747.

laws." This concern, however, must be balanced with the Supreme Court's decision in *United States v. Morrison*, 449 U.S. 361 (1981). Judge Alarcon explained in his concurring and dissenting opinion in *D.L.*:

> In *Morrison,* the Court held that when the Government has improperly obtained incriminating information from an accused "the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." *Id.* Here, the District Court dutifully complied with *Morrison* by excluding Jose's statements. The Supreme Court instructed in *Morrison* that where evidence has been obtained in violation of the Fourth, Fifth, or Sixth Amendments, "[t]he remedy in the criminal proceeding is limited to denying the fruits of the transgression." *Id.* at 366 . . . The Court also stated:
>
> > Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.
>
> *Id.* at 366 n. 3 . . . (quoting *United States v. Blue,* 384 U.S. 251, 255 (1966)).

453 F.3d at 1133. The majority's focus on the alleged egregiousness of the agents' failures to comply with the provisions of the JDA, majority opinion at page 5331, does not

justify its failure to adhere to the Supreme Court's admonition in *Morrison*.

My review of the record indicates that the district court correctly determined that on balance, the violations did not require the dismissal of the juvenile information when it stated:

> Obviously, the prejudice would stem principally from the use of any such confession, but that is absent here since there is no evidence being received of his confession. And there is not any other prejudice or constitutional violation arising simply from the other conduct attributed to the border patrol agents; that is the consulate issue and the delay in mirandizing Mr. M.

This ruling does not reward the Government for failing to abide by the JDA. Rather, as the Government recognized, the misconduct deprived it of the use of C.M.'s statements at trial. Where, however, the Government proves its case at trial beyond a reasonable doubt without the use of, or reference to, the juvenile's statement, justice does not require that the guilty defendant be absolved just because he is a juvenile.

II

Even if there was some question as to whether the violations of the JDA were prejudicial, the appropriate remedy is a remand, not an order vacating the adjudication of delinquency and dismissing the juvenile information. In *D.L.* we stated that "where the record does not satisfy us, beyond a reasonable doubt, that a violation of the JDA was harmless, a remand to the district court is appropriate." 453 F.3d at 1126 (emphasis omitted). In *RRA-A*, even though we found that RRA's confession "was the primary basis of evidence on which she was convicted," and should have been suppressed, we reversed and remanded, but did not direct the dismissal of

the juvenile information. 229 F.3d at 747. Similarly, in *Doe IV* we determined that the improperly obtained statements used against Doe "were highly prejudicial and should have been suppressed," but we did not direct the dismissal of the juvenile information, but reversed and remanded "for further proceedings not inconsistent with this opinion." 219 F.3d at 1018. Also in *Doe II*, when the statements were introduced through cross-examination, we nonetheless remanded "for the district court to make all findings relevant to a determination of whether the government's violations of the notice and speedy arraignment provisions of the Federal Juvenile Delinquency Act prejudiced Doe's defense." 862 F.2d at 781.[4]

Based on these precedents — where the use of statements procured in violation of the JDA were clearly more adverse to the defendants than the statement in this case was to C.M. — the proper remedy is a remand, not the vacation of the juvenile information. Moreover, the district court on the remand should focus, as we held in *Doe II*, on whether the violations prejudiced C.M.'s *defense*.

For the foregoing reasons I dissent. I would affirm C.M.'s conviction because the violations of the JDA did not prejudice C.M.'s defense to the juvenile information. Moreover, even if I had some question as to whether the violations were harmless, our precedent instructs that the appropriate remedy is a remand for the district court to consider the appropriate remedy, not a direction to vacate the adjudication of delinquency and dismiss the juvenile information.

---

[4]I recognize that there is language in *Doe II* that is repeated in *RRA-A* that "we have the discretion to reverse or to order more limited remedies." *Doe II*, 862 F.2d at 780; *RRA-A*, 229 F.3d at 747. I do not question this statement of the breadth of our options, but read the specific remedies ordered in those cases as guiding what we should do in this case.